**Nos. 23-11157, 23-11199, 23-11203, 23-11204, 23-40685**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————

Case No. 23-11157

————————————

SECOND AMENDMENT FOUNDATION, INCORPORATED; RAINIER ARMS, L.L.C.; SAMUEL WALLEY; WILLIAM GREEN,

Plaintiffs-Appellants,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, *in his official capacity Director of the Bureau of Alcohol Tobacco Firearms and Explosives*; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, *U.S. Attorney General,*

Defendants-Appellees

consolidated with

*caption continued on following page*

————————————

On Appeal from the United States District Court
for the Northern District of Texas in Nos. 3:21-cv-116, 4:23-cv-95, 2:23-cv-19, and 4:23-cv-578; and
from the United States District Court for the Southern District of Texas in No. 6:23-cv-13

————————————

## APPELLANTS' OPENING BRIEF
### in Nos. 23-11199, 23-11203, 23-11204, and 23-40685
————————————

> BRIAN M. BOYNTON
> *Principal Deputy Assistant Attorney General*
>
> LEIGHA SIMONTON
> ALAMDAR S. HAMDANI
> *United States Attorneys*
>
> ABBY C. WRIGHT
> SEAN R. JANDA
> BEN LEWIS
> *Attorneys, Appellate Staff*
> *Civil Division, Room 7250*
> *U.S. Department of Justice*
> *950 Pennsylvania Avenue NW*
> *Washington, DC 20530*

Case No. 23-11199

————————————

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INCORPORATED, *a nonprofit corporation*; MAXIM DEFENSE INDUSTRIES, L.L.C.,

Plaintiffs-Appellees,

v.

MERRICK GARLAND, *U.S. Attorney General, in his official capacity as Attorney General of the United States*; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, *in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives*,

Defendants-Appellants

consolidated with

————————————

Case No. 23-11203

————————————

DARREN A. BRITTO; GABRIEL A. TAUSCHER; SHAWN M. KROLL,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendant-Appellant

consolidated with

————————————

Case No. 23-11204

————————————

TEXAS GUN RIGHTS, INCORPORATED; NATIONAL ASSOCIATION FOR GUN RIGHTS, INCORPORATED,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendant-Appellant

consolidated with

―――――――――――――

Case No. 23-40685

―――――――――――――

STATE OF TEXAS; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION;
BRADY BROWN,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; UNITED STATES DEPARTMENT OF
JUSTICE; STEVEN M. DETTELBACH, *Director of ATF*,

Defendants- Appellants

―――――――――――――

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties. 5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

The district courts in these four cases entered preliminary relief prohibiting the enforcement of a Rule issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. The Rule interprets the National Firearms Act (NFA), clarifies that the NFA's important public-safety taxation scheme applies to short-barreled rifles constructed from so-called "stabilizing braces," and provides guidance for determining whether any particular braced firearm is a short-barreled rifle. The United States Court of Appeals for the Eighth Circuit and three other district courts have considered motions for a preliminary injunction or injunction pending appeal similar to the requests at issue in this appeal, and each has denied those motions. Given the public safety and regulatory clarity goals furthered by the challenged Rule, the government respectfully requests that the Court hold oral argument in this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION ................................................................ 3

STATEMENT OF THE ISSUES ..................................................................... 4

PERTINENT STATUTES AND REGULATIONS ...................................... 4

STATEMENT OF THE CASE ........................................................................ 5

      A.    Legal Background ............................................................... 5

      B.    Procedural History ........................................................... 11

SUMMARY OF ARGUMENT ....................................................................... 17

STANDARD OF REVIEW ............................................................................ 22

ARGUMENT ..................................................................................................... 23

I.    Two of the District Courts Erred in Concluding that the Plaintiffs Before Them Demonstrated a Likelihood of Success ......................... 23

      A.    The *Britto* Court Erred in Finding Plaintiffs Likely to Succeed on a Claim They Disavowed .................................... 23

      B.    The *Texas Gun Rights* Plaintiffs Are Unlikely to Succeed on Their Arbitrary-and-Capricious Claim ............................. 26

II.    The Equitable Factors Do Not Support Preliminary Relief .............. 32

      A.    Plaintiffs Face No Irreparable Harm ........................... 32

      B.    The Balance of the Equities Favors Reversal ............ 40

III.    At a Minimum, This Court Should Reverse the District Courts' Overbroad Relief ................................................................................ 43

      A.    The *Britto* Court Erred in Staying the Rule Universally ......... 44

B.     The *Mock*, *Texas Gun Rights*, and *Texas* District Courts Erred by
       Extending Relief to Unidentified Members of the Plaintiff
       Organizations ................................................................................. 48

CONCLUSION ........................................................................................... 53

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# INTRODUCTION

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as particularly dangerous weapons. A short-barreled rifle is a "rifle"—that is, a firearm "designed," "made," and "intended" to be "fired from the shoulder"—with a barrel shorter than 16 inches. 26 U.S.C. § 5845. A typical short-barreled rifle is shown below:



*See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6525 (Jan. 31, 2023) (Rule). Such a firearm is designed for the shooter to press the "stock"—the rearward piece—against his or her shoulder when firing.

Recently, some manufacturers have sold firearms with short barrels and rearward attachments marketed as "stabilizing braces." These manufacturers claim that those firearms are not rifles because they are not designed to be fired from the shoulder. Instead—these manufacturers claim—the stabilizing brace is designed to rest against or wrap around a shooter's forearm to assist with one-handed firing. Many braced weapons, however, are indistinguishable from those with stocks:



*See* ROA.23-11199.506; 88 Fed. Reg. at 6494 (top item equipped with "brace" and bottom equipped with traditional stock). Such weapons should therefore be sold in compliance with the NFA.

In response to this evasion of federal law—and resulting confusion among the public—the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued a rule explaining when a weapon is a short-barreled rifle within the meaning of the NFA. The Rule explains that the agency had previously issued individual determinations evaluating whether particular braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to the manufacturer's stated intent. The Rule therefore clarifies that whether a braced weapon is designed and intended to be fired from the shoulder does not turn solely on the manufacturer's claimed intent; instead, the standard also focuses on the weapon's objective design features and other evidence. The Rule then sets forth the evidence that ATF will consider when determining whether any particular firearm equipped with a brace is designed and intended to be shoulder-fired.

In each of the four cases addressed in this brief, the district court entered preliminary relief against enforcement of the Rule, including one court that issued nationwide relief. In a separate suit, a district court in this Circuit ruled in favor of the government. On appeal, this Court consolidated all the cases and established a briefing format in the nature of a cross-appeal, such that this brief represents the government's opening brief in the four cases where the district courts granted relief.

As explained below, the district court decisions in these four cases were erroneous on all levels, and this Court should reverse the preliminary injunctions and stay.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, 5 U.S.C. § 701 *et seq.*, and 28 U.S.C. § 2201. *See* ROA.23-11199.147; ROA.23-11203.15; ROA.23-11204.12; ROA.23-40685.18. The district courts in *Mock*, *Texas Gun Rights*, and *Texas* granted motions for preliminary injunction on October 2, 2023; October 4, 2023; and October 27, 2023, respectively. *See* ROA.23-11199.1083; ROA.23-11204.330; ROA.23-40685.1025. The district court in *Britto* stayed the Rule in its entirety on November 8, 2023. *See* ROA.23-11203.1335. The government filed a timely notice of appeal in each case on November 29, 2023. *See* ROA.23-11199.1313; ROA.23-11203.1344; ROA.23-11204.350; ROA.23-40685.1062. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

3

## STATEMENT OF THE ISSUES

Plaintiffs in these four consolidated cases challenged the Rule and sought preliminary relief. In each case, the district court granted plaintiffs' motion. Relying on this Court's previous decision in *Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023), that the Rule is a legislative rule that was not a logical outgrowth of the proposed rule, three of the district courts held that plaintiffs were likely to succeed on that basis. The fourth held that plaintiffs were likely to succeed because the Rule is arbitrary and capricious. And all four district courts held that plaintiffs demonstrated that the equitable factors supported preliminary relief. As a remedy, three of the district courts entered a preliminary injunction generally prohibiting enforcement of the Rule against plaintiffs, and the fourth district court stayed the Rule in its entirety. The issues presented are the following:

1. Whether plaintiffs failed to demonstrate a likelihood of success on the merits of their claims;

2. Whether plaintiffs failed to demonstrate that the equitable factors weigh in favor of preliminary relief; and

3. Whether the relief entered by the district courts was impermissibly overbroad.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

4

## STATEMENT OF THE CASE

### A.    Legal Background

**1.** The National Firearms Act, 26 U.S.C. § 5801 *et seq.*, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include powerful "concealable weapon[s]," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like short-barreled shotguns and, as relevant here, short-barreled rifles. *See* H.R. Rep. No. 90-1956, at 34 (1968) (Conf. Rep.).

For those firearms, the NFA establishes a taxation-and-registration scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). This scheme tracks "the flow of [NFA] firearms" to ensure they stay away from criminal, dangerous, or irresponsible individuals. *Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). Importers, manufacturers, and dealers in covered firearms, including short-barreled rifles, must pay an annual special occupational tax of $1000 or $500. *See* 26 U.S.C. § 5801. In addition, individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm, including a short-barreled rifle, must pay a $200 tax per firearm made. *See id.* § 5821. Finally, any entity or individual who wishes to transfer an NFA firearm is required to pay a $200 tax for each firearm transferred. *See id.* § 5811.

In addition, "[i]n order to facilitate enforcement" of the NFA's tax, the statute imposes registration and approval requirements. *United States v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997). Thus, individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, the individual must file a written application with ATF that includes identifying information about "the firearm to be made" as well as identifying information, including fingerprints and a photograph, about the maker. *Id.* § 5822. Once the application is filed and the tax is paid, ATF may approve the application. *See id.* "Upon receipt of the approved application, the maker is authorized to make the firearm described therein." 27 C.F.R. § 479.64.

Moreover, both a qualified manufacturer and an individual who has his application to make a firearm approved must register each firearm made. *See* 26 U.S.C. § 5841. And to transfer a covered firearm, a transferor must go through a similar process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

If the maker of a firearm wishes to challenge the assessment of the NFA's tax against him, the Internal Revenue Code provides a mechanism to do so. The maker may file a claim for a refund or credit with the Attorney General. *See* 26 U.S.C. § 6511. If the maker is dissatisfied with the result of that administrative process, she may bring suit in district court in a civil action for a refund of the tax. *See id.* § 7422.

6

**2.** ATF is responsible for enforcing the NFA. *See* 26 U.S.C. § 7801. ATF must therefore determine which firearms constitute "short-barreled rifles." Under the NFA, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).

As shown in the previous images, *see supra* pp. 1-2, a short-barreled rifle has, at the front end, a receiver and a short barrel. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. 88 Fed. Reg. at 6522. It has long been the case that the stock, like many firearm components, is often detachable or sold separately. *See, e.g.*, ATF, Rev. Rul. 61-45, 1961-1 C.B. 663; ATF, Rev. Rul. 61-203, 1961-2 C.B. 224.

Over the last decade, ATF has received an increasing number of requests to determine whether short-barreled firearms equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g., id.* at 6483. Manufacturers have claimed that braced firearms are not designed to be fired from the shoulder but, instead, that the brace is designed to "assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482.

In many cases, however, firearms with stabilizing braces appear nearly identical to those with stocks:



*See* 88 Fed. Reg. at 6527-29 (left item equipped with stock; right items with brace).

And as shown in marketing materials and trade magazines, many firearms equipped with braces are designed to be shouldered in the same way as firearms with stocks.



*See id.* at 6527, 6546 (both "arm braces"; gun publication on left; trade magazine on right).

Between 2012 and 2020, ATF reviewed various braced weapons for classification under the NFA, assessing whether each firearm was designed and intended to be fired from the shoulder. ATF made clear that designing a "stabilizing brace for use as a shoulder stock" or "configur[ing] the [brace] device for use as a shoulder-stock" may yield a short-barreled rifle, and ATF classified "the majority" of submitted samples as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation

omitted). But these classifications, which applied "only to the particular sample[s]" submitted, were not always consistent, either in their methodologies or in their conclusions. *Id.* at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). The agency's analysis sometimes improperly focused on "whether the 'stabilizing brace' at issue could be used as a 'brace' to support single-handed fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder." *Id.* at 6501-02. And ATF sometimes "plac[ed] improper weight on the manufacturer's stated intent," *id.* at 6502, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion" and there was "a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

**3.** To provide that clarity, the agency issued the Rule, which "inform[s] the public of the best interpretation" of how to apply the NFA's design-and-intent standard to firearms equipped with a "stabilizing brace." 88 Fed. Reg. at 6502. The Rule primarily reiterates that in determining whether such firearms are "rifles"—that is, whether they are designed and intended to be fired from the shoulder—the manufacturer's "stated intent will not necessarily be dispositive." *Id.* at 6479. Instead, the agency will consider whether other relevant evidence, such as the firearm's

9

"objective design features," marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

More specifically, the Rule states that the statutory definition of "rifle" encompasses a firearm equipped with a stabilizing brace "that provides surface area that allows the weapon to be fired from the shoulder, provided that other" evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. The Rule then identifies evidence that ATF believes will generally be probative in determining whether any particular firearm is designed and intended to be shoulder-fired. That evidence includes objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* It also includes the "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6570.

The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. 88 Fed. Reg. at 6480. But the Rule also makes clear that it is possible to design a braced weapon that is not a rifle. For example, a braced weapon

might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

The Rule also provides compliance options for individuals who possess unregistered brace-equipped short-barreled rifles, with the Department exercising its enforcement discretion to permit registration by May 31, 2023, without penalty or tax. 88 Fed. Reg. at 6480-81. Finally, because not all previous classification letters had followed a proper approach, the Rule clarifies that those letters are no longer valid. *Id.*

### B.    Procedural History

The consolidated appeals addressed by this brief arise from four district court cases: *Mock*, *Britto*, *Texas Gun Rights*, and *Texas*.[1] In each suit, plaintiffs—a mix of individuals, commercial entities, and advocacy groups—challenged the Rule and moved for preliminary relief.

---

[1] A fifth appeal, in *Second Amendment Foundation v. ATF*, No. 23-11157, is also consolidated with the four appeals addressed by this brief. In that case, the district court denied plaintiffs' motion for a preliminary injunction against the Rule and plaintiffs appealed. Under the briefing format adopted by the Court, this brief represents only the government's opening brief in the four cases in which it is appellant, and, thus, this brief does not further address the appeal in *Second Amendment Foundation*.

**1.** In March 2023, the district court in *Mock* denied plaintiffs' motion for a preliminary injunction, concluding that plaintiffs were unlikely to succeed on the merits of any claim. *See* ROA.23-11199.569. Plaintiffs appealed that denial and moved for an injunction pending appeal. A motions panel of this Court granted that motion and enjoined enforcement of the Rule against the named individual, commercial, and organizational plaintiffs in *Mock*, as well as their families, customers, and members. *See* Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 26, 2023). Following that order, the district court in two of the remaining cases issued similar preliminary relief limited to some of the plaintiffs and pending the outcome of the *Mock* appeal. *See* ROA.11203.1240; ROA.23-40685.870.

The merits panel in *Mock* reversed the denial of the preliminary injunction, on the ground that plaintiffs were likely to succeed on their claim that the Rule violated the Administrative Procedure Act's (APA) notice-and-comment procedures under the logical-outgrowth doctrine. *See Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023). The Court first concluded that the rule was a legislative rule. *See id.* at 578-83. Having determined that the rule was legislative, the Court held that the agency did not comply with notice-and-comment requirements because the final rule was not a logical outgrowth of the proposed rule. *See id.* at 583-86. The Court therefore reversed the denial of the preliminary injunction and remanded for the district court to consider the remaining preliminary-injunction factors, including the scope of any injunction. *See id.* at 586-88.

**2.** Following this Court's decision in *Mock*, the district courts in three of the cases granted preliminary injunctions limited to some or all the plaintiffs. The fourth district court stayed the Rule in its entirety.

**a.** On remand, plaintiffs in *Mock*—two individuals, a firearms advocacy group, and one manufacturer and seller of braces—again requested a preliminary injunction, and the district court granted their motion. First, the court explained that this Court's decision established that plaintiffs had demonstrated a likelihood of succeed on the merits of their logical-outgrowth claim. *See* ROA.23-11199.1092.

The court then concluded that both the two individual plaintiffs and the commercial plaintiff had demonstrated irreparable harm. With respect to the individual plaintiffs, the court determined that enforcement of the Rule would generate irreparable compliance costs because it would force the individual plaintiffs to destroy the braced firearms or braces that they possess (or otherwise risk criminal prosecution for possession of an unregistered short-barreled rifle). *See* ROA.23-11199.1094-98. The court also found "irreparable constitutional injury" because it believed that the Rule "would impair or threaten infringement upon the presumptive Second Amendment-protected conduct" of the individual plaintiffs in possessing braced firearms. *See* ROA.23-11199.1098 n.16, 1098-107. In reaching that conclusion, the court made clear that it was "mak[ing] no holding on this motion as to whether the Final Rule violates Plaintiffs' Second Amendment rights," ROA.23-11199.1105; instead, the court stated, the mere "alleged violation" was

sufficient "to demonstrate that irreparable harm is suffered or threatened," ROA.23-11199.1098 (quotation omitted).

The district court next held that the commercial plaintiff had demonstrated irreparable harm. The court primarily concluded that the "market for the" braced pistols classified as short-barred rifles under the Rule "has evaporated," causing the commercial manufacturer and seller of braces substantial financial injury and threatening the continued existence of its business. ROA.23-11199.1112-16.

In concluding that the balance of the equities and the public interest weighed in favor of relief, the court expressed a belief that because plaintiffs were likely to succeed on the merits of their logical-outgrowth claim, there could be "*no* injury" that the government or public "could possibly suffer from if enforcement of the Final Rule were enjoined." ROA.23-11199.1117; *see also* ROA.23-11199.1116-17 ("[T]he government-public-interest equities evaporate upon an adverse decision touching upon the merits.").

The district court granted plaintiffs a preliminary injunction but declined to "extend the scope of the injunctive relief 'nationwide.'" ROA.23-11199.1119. Instead, the court limited its injunction to enforcement of the Rule against the individual plaintiffs (and their family members); the business plaintiff (and its customers); and the advocacy organization "and all of its members." ROA.23-11199.1118.

**b.** In *Texas Gun Rights*, plaintiffs—two advocacy organizations—moved in front of the same district court for a preliminary injunction against the Rule. *See*

ROA.23-11204.332. These plaintiffs did not argue, however, that the Rule was not a logical outgrowth of the proposed rule; instead, they argued that the Rule is arbitrary and capricious. *See* ROA.23-11204.334. In granting relief, the Court agreed. The court believed that Rule "inexplicably and fundamentally switched [ATF's] position" on how to classify braced firearms "without providing sufficient explanations." ROA.23-11204.335. And the court faulted ATF for two slideshow presentations stating that approximately 60 specific braced firearms constituted short-barreled rifles without further explanation. *See* ROA.23-11204.336.

Reiterating its analysis from *Mock*, the court determined that the organizations' members were irreparably harmed and that the balance of the equities and the public interest weighed in favor of relief. ROA.23-11204.337-38. The court enjoined ATF from enforcing the Rule against the two organizations and their members (except for members prohibited from possessing firearms under 18 U.S.C. § 922(g)). *See* ROA.23-11204.338-39.

**c.** In *Texas*, plaintiffs—the State of Texas, two advocacy organizations, and one individual—similarly moved for a preliminary injunction against the Rule, and the district court granted that motion in part. At the outset, the court held that one of the organizations and the State of Texas had likely not demonstrated standing. *See* ROA.23-40685.1038-44. The court then concluded that the remaining organization and the individual plaintiff were likely to succeed on their logical outgrowth claim in light of this Court's *Mock* decision. *See* ROA.23-40685.1044.

With respect to irreparable harm, the district court held that the individual plaintiff had shown that the Rule would cause him irreparable harm in the form of compliance costs—such as the costs to destroy or modify the braced firearms he owns to render them compliant with the NFA. ROA.23-40685.1047-78. And the court further concluded that the organization's members would likely suffer the same harms. *See* ROA.23-40685.1046. The court also decided that those compliance costs were more "immediate and imminent" than those of the government and public. ROA.23-40685.1049-50. The court issued a preliminary injunction limited to the individual plaintiff (and his family members) and the current members of the organizational plaintiff (and their family members). *See* ROA.23-40685.1052.

**d.** The plaintiffs in *Britto*—three individuals—also renewed their request for a preliminary injunction following *Mock*. Like the plaintiffs in *Texas Gun Rights*, the *Britto* plaintiffs did not include a logical-outgrowth claim in their complaint or their motion for a preliminary injunction. After this Court's decision in *Mock*, the parties filed a joint status report explaining their shared view that *Mock*'s "decision on likelihood of success does not control here, as Plaintiffs do not raise a logical outgrowth claim." ROA.23-11203.1276-77.

Nevertheless, the district court granted plaintiffs' motion stating only "that the Rule 'was not a logical outgrowth of the Proposed Rule' and 'must be set aside as unlawful.'" ROA.23-11203.1339. The court did not address the fact that plaintiffs had never raised a logical-outgrowth claim.

16

The court found that plaintiffs would suffer irreparable harm from the Rule in the form of compliance costs. ROA.23-11203.1341-42. And the court determined, relying on the district court decision in *Mock*, that the government and public had no interest in enforcement of the Rule because it is unlawful. ROA.23-11203.1342-43. The court thus granted plaintiffs' motion and stayed the rule in its entirety and not as to any particular plaintiffs. *See* ROA.23-11203.1343. In entering that nationwide stay, the court did not discuss the appropriate scope of relief, nor did it conclude that a nationwide stay of the Rule, rather than a tailored preliminary injunction, was necessary to redress the three individual plaintiffs' compliance cost harms.

**3.** The government appealed each of the decisions. *See* ROA.23-11199.1313; ROA.23-11203.1344; ROA.23-11204.350; ROA.23-40685.1062. On appeal, this Court consolidated these four cases, along with one additional case in which plaintiffs appeal the district court's denial of a motion for a preliminary injunction.

## SUMMARY OF ARGUMENT

In a prior decision, *Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023), this Court determined that plaintiffs were likely to succeed on their challenge to the Rule—which provides clarification to the public of how ATF interprets a statutory term in response to widespread confusion and evasion of statutory constraints—on the basis that it was procedurally unsound under the Administrative Procedure Act. But this Court did not enjoin the Rule or enter other relief. Rather it remanded to the district court to determine whether plaintiffs had met their burden to demonstrate an

equitable entitlement to preliminary relief. Both the motions panel and the merits panel declined to enter nationwide relief.

On remand in *Mock*, and in three other suits, district courts erroneously concluded that plaintiffs—a mix of individuals, manufacturers, and advocacy organizations—demonstrated that they would be harmed by a Rule that does nothing more than inform the public of ATF's view regarding when a firearm with a "brace" attached is a short-barreled rifle. In so holding, the district courts ignored the text of the Rule and the reality that any purported irreparable harm was de minimis and self-inflicted.

Three of those four decisions properly limited relief to the named plaintiffs (although extending relief too broadly to organizational plaintiffs). But one district court went further: with no analysis that court entered nationwide relief staying the Rule. And it did so based on a claim that plaintiffs in that case affirmatively disavowed.

This Court should reverse in Nos. 23-11199 (*Mock*), 23-11203 (*Britto*), 23-11204 (*Texas Gun Rights*), and 23-40685 (*Texas*). The merits analyses of the *Britto* and *Texas Gun Rights* district courts fail. And each district court made fundamental errors concerning the availability of equitable relief and the scope of any such relief. At the very least, this Court should vacate the nationwide stay, which flouts bedrock constitutional, equitable, and administrative law principles.

**I.** Even proceeding from this Court's conclusion that the Rule is procedurally improper, two of the district courts erred in concluding that plaintiffs were likely to succeed on the merits.

The *Britto* district court erred in relying on *Mock*. Plaintiffs did not include any logical outgrowth claim in their complaint or their motion for preliminary relief; to the contrary, they expressly waived any such claim even after this Court's decision in *Mock*. The district court's award of relief on that ground thus violates the fundamental principle that courts "normally decide only questions presented by the parties." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987)).

The *Texas Gun Rights* district court also erred in concluding that plaintiffs are likely to succeed on the merits of their arbitrary-and-capricious claim. Although the court believed that the Rule reflected an unexplained fundamental shift in the agency's approach to braced firearms, that is incorrect. For one, as the Rule makes clear, ATF has long determined that braced firearms may be short-barreled rifles under the NFA and, even before the Rule, classified the majority of submitted samples as short-barreled rifles. The Rule seeks to provide additional clarity and ensure consistency in classifications, in the face of some previous inconsistency in the agency's case-by-case determinations. It thus does not reflect the about-face that the district court perceived. Regardless, the Rule provides a substantial explanation of the ways in

19

which it differs from certain previous classification letters and of the reasons that ATF believes the Rule will promote consistent and correct determinations.

Nor did the district court properly rely on two slideshows created by ATF, which stated without elaboration that certain braced firearms were short-barreled rifles. Most fundamentally, even if the slideshows—which were issued after the Rule and independent of it—were improper, that would provide no basis for relief against the Rule itself. In any event, the slideshows are not reviewable final agency action. And, even considered on their own terms, the slideshows are reasonable for the purpose they serve: putting the public on notice of ATF's view that certain braced weapons are short-barreled rifles.

**II.** Plaintiffs have uniformly failed to demonstrate that equitable factors weigh in favor of preliminary relief.

No plaintiff has demonstrated irreparable harm from the Rule. The district courts' conclusion that the individual plaintiffs will suffer irreparable compliance costs fails, both because the NFA's requirements are not sufficiently burdensome to constitute irreparable harm and because the Rule's compliance options permitted them to avoid much of the burden of those requirements anyway. And plaintiffs cannot manufacture irreparable harm by choosing not to comply with the NFA or the Rule and then complaining about the consequences. Nor were the district courts correct to conclude that plaintiffs' mere allegation of a Second Amendment violation

was enough to demonstrate irreparable harm in the absence of any determination by the court that plaintiffs are likely to succeed on their constitutional claims.

Equally erroneous is the *Mock* district court's conclusion that Maxim Defense, the one commercial plaintiff in these cases, demonstrated harm from reduced sales following the Rule. Those harms are attributable to Maxim's customers' choices and not to the Rule. And regardless, Maxim could mitigate any concerns by manufacturing designs that are not short-barreled rifles or by simply complying with the NFA.

In addition, the balance of equities and the public interest weigh against relief. ATF's previous case-by-case approach to classifying braced weapons led to confusion, regulatory inconsistency, and circumvention of the controls Congress deemed necessary for public safety. The Rule alleviates those problems by providing a clear explanation of ATF's understanding of the statute's application to braced firearms. The relief granted in these cases undermines the substantial public interests that the Rule advances and should not be countenanced.

**III.** Even assuming relief were appropriate, each district court erred in entering overbroad relief.

At the most extreme, the *Britto* court erred by entering a nationwide stay of the Rule rather than relief limited to the three individual plaintiffs. It is well settled that constitutional and equitable principles require a court to limit equitable relief to redressing the injuries of specific plaintiffs before the court. The *Britto* court's relief—

entered with no discussion of the appropriate scope of relief and based on a claim disavowed by the parties—violates that fundamental rule and must be vacated.

The remaining district courts also erred in extending preliminary injunctions to benefit all unnamed, unidentified members of the plaintiff organizations. Although the organizational plaintiffs claim to represent hundreds of thousands, if not millions, of unidentified members, those organizations have failed to demonstrate the requisite indicia of membership—such as a membership structure and some ability for members to direct and control the organization—to litigate on their behalf. And even if the organizational plaintiffs could demonstrate Article III standing, equitable principles restricting asymmetric suits would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. That is particularly true given the potential overlap in membership among the multiple organizations that have brought separate suits against the Rule; some of which have succeeded, and some of which have not. As it stands now, such members' claims have been duplicated across these suits, affording those individuals relief so long as even one organization succeeds.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.     Two of the District Courts Erred in Concluding that the Plaintiffs Before Them Demonstrated a Likelihood of Success

In an earlier ruling, this Court concluded that the rule was a legislative rule, *Mock v. Garland*, 75 F.4th 563, 578-83 (5th Cir. 2023), and that the agency did not comply with notice-and-comment requirements because the final rule was not a logical outgrowth of the proposed rule, *see id.* at 583-86. The government respectfully disagrees with those conclusions and preserves that objection for any further review, but the government does not challenge those holdings in this brief. Nevertheless, plaintiffs in two of the suits failed to demonstrate a likelihood of success on the merits.

### A.     The *Britto* Court Erred in Finding Plaintiffs Likely to Succeed on a Claim They Disavowed

The court in *Britto* determined that plaintiffs were likely to succeed entirely on the basis that the Rule is not a logical outgrowth of the rule the agency proposed. But

23

the *Britto* plaintiffs did not advance—and indeed affirmatively disavowed—any such

claim. *See* ROA.23-11203.1339; *see also* ROA.23-11203.1276-77.

As the Supreme Court has explained, the party-presentation principle requires

that courts "normally decide only questions presented by the parties." *United States v.*

*Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *United States v. Samuels*, 808 F.2d

1298, 1301 (8th Cir. 1987)). That is because we have an "adversarial system of

adjudication[] . . . designed around the premise that parties represented by competent

counsel know what is best for them, and are responsible for advancing the facts and

argument entitling them to relief." *Id.* (alteration omitted) (quotation omitted). "[I]n

both civil and criminal cases, in the first instance and on appeal . . . , [courts] rely on

the parties to frame the issues for decision and . . . [adopt] the role of neutral arbiter

of matters the parties present." *Id.* (first alteration in original) (quoting *Greenlaw v.*

*United States*, 554 U.S. 237, 243 (2008)); *see, e.g.*, *United Nat. Foods, Inc. v. National Labor*

*Relations Bd.*, 66 F.4th 536, 546 (5th Cir. 2023). As such, a court may not "take[]over"

the litigation, and it must consider the case in a way "bearing a fair resemblance to the

case shaped by the parties." *Sineneng-Smith*, 140 S. Ct. at 1581-82.

The district court in *Britto* awarded a preliminary injunction to the plaintiffs on

the sole grounds that they were likely to succeed on a claim that the Rule violated the

logical-outgrowth doctrine under the APA. *See* ROA.23-11203.1339. But the plaintiffs

in that case did not bring any logical-outgrowth claim in their complaint, and they did

not seek a preliminary injunction on such grounds. *See* ROA.23-11203.23-31, 672-706.

Indeed, to the contrary—and even after this Court's decision in *Mock*—the parties reiterated to the district court in a joint filing that plaintiffs were not advancing any logical-outgrowth claim and that the court should evaluate the merits of the claims actually presented by plaintiffs. *See* ROA.23-11203.1276-77. Thus, the district court "violated the party presentation principle by invoking this [claim] sua sponte." *D & J Invs. of Cenla, L.L.C. v. Baker Hughes a G E Co.*, 52 F.4th 187, 201 (5th Cir. 2022) (Haynes, J., concurring in part and dissenting in part).

No "extraordinary circumstances" justify the district court's decision to award relief on a claim that plaintiffs had disavowed. *Sineneng-Smith*, 140 S. Ct. at 1581. As this Court has explained, a plaintiff is "the master of her complaint." *Cody v. Allstate Fire & Cas. Ins. Co.*, 19 F.4th 712, 715 (5th Cir. 2021) (quoting *Carpenter v. Wichita Falls Indep. Sch. Dist.*, 44 F.3d 362, 366 (5th Cir. 1995)). Plaintiffs could have pled, as numerous other plaintiffs did, a logical outgrowth claim. And plaintiffs here did not simply fail to raise a logical-outgrowth claim—they affirmatively represented to the district court that they did not intend to pursue any such claim. *Cf. Sineneng-Smith*, 140 S. Ct. at 1581 (reversing a judicial "takeover" where "counsel had presented a contrary theory of the case in the District Court"). The district court, without acknowledging this waiver or explaining its decision to disregard it, thus made a "radical transformation" of the litigation. *Id.* at 1581-82. That decision was improper, and the court's grant of a preliminary injunction on this basis should be reversed.

### B.    The *Texas Gun Rights* Plaintiffs Are Unlikely to Succeed on Their Arbitrary-and-Capricious Claim

In *Texas Gun Rights*, alone among the cases on appeal, the district court concluded that plaintiffs were likely to succeed on their claim that the Rule is arbitrary and capricious. The "highly deferential" arbitrary-and-capricious standard provides only for "narrow" review. *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009). To clear that bar, agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The Rule more than meets that bar, and the district court's contrary conclusion is erroneous.

**1.** In reaching its conclusion, the *Texas Gun Rights* district court primarily concluded that the Rule did not provide a "sufficient explanation[]" for what the court viewed as a "fundamental[] switch[]" of ATF's position on how to classify braced firearms. ROA.23-11204.335. That is incorrect on all levels. Contrary to the Court's suggestion, the Rule itself does not reflect any fundamental shift in the agency's approach to classifying short-barreled rifles. And regardless, ATF properly acknowledged and reasonably explained any departure from its previous approach.

At the outset, the district court's statement that the Rule reflects a fundamental shift in ATF's approach is incorrect. Before the Rule, ATF made clear that designing a "stabilizing brace for use as a shoulder stock" may yield a short-barreled rifle, and

ATF made classification determinations on a case-by-case basis with "the majority" of submitted samples classified as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted).

Similarly, ATF has made clear in the Rule that the statutory determination whether any particular braced firearm is a short-barreled rifle must be made based on the particular design features and other relevant evidence specific to any particular weapon platform. *See* 88 Fed. Reg. at 6569 (stating that a braced firearm will be classified as a short-barreled rifle only if, among other things, the evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder"). The Rule estimates that at least "a majority" of existing firearms equipped with braces are likely to be classified as "rifles" or "short-barreled rifles" configured to be fired from the shoulder. *Id.* at 6480. But the Rule also clarifies that it is possible to design a braced weapon that is not a rifle. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might have "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

Thus, at bottom, the Rule does not reflect any fundamental or categorical shift in ATF's approach to classifying braced firearms. Both before and after the Rule, ATF has understood that the majority of braced firearms are likely to be short-barreled rifles and has employed a case-by-case approach to determining whether any

particular braced firearm is designed and intended to be fired from the shoulder. Thus, far from reflecting some about-face by the agency, the Rule simply reflects ATF's attempt to refine and clarify its approach to the question of how to apply the statute to braced weapons.

Nevertheless, the Rule also acknowledges that the approach articulated in the Rule is not wholly consistent with the approach reflected in each classification letter issued before the Rule. That is so in large part because, as the Rule explains, the previous classification letters themselves were not always consistent, either in their methodologies or in their conclusions. 88 Fed. Reg. at 6482, 6484 n.26; *see id.* at 6479 n.9 (collecting examples). Thus, for example, some early letters sometimes focused on irrelevant factors that did not properly reflect the statutory design-and-intent standard, and they sometimes placed improper weight on a manufacturer's stated intentions. *See id.* at 6501-02.

It was precisely this inconsistency that the agency sought to remedy through the Rule. As the Rule explains, the agency's inconsistent approach "had led to confusion" among the regulated public; to classifications that did not comport with the best understanding of the NFA; and to "an incorrect public perception" that "a firearm equipped with a 'stabilizing brace' never falls within the purview of the NFA." 88 Fed. Reg. at 6494, 6501-02. And ATF further came to understand that, as was made "abundantly evident in publications and consumer and marketing material issued by firearms manufacturers," the firearms industry and consumers were widely

28

circumventing the NFA through the "prevalent use of [braced] firearms as rifles." *Id.*
at 6503-06.

In short, the Rule acknowledges that the approaches reflected in previous
classification letters were not always consistent with each other or with the approach
articulated in the Rule. And the Rule explains that the purposes of issuing the Rule
include promoting regulatory clarity; preventing circumvention of the NFA; and
ensuring that ATF will consistently use "the proper legal and factual analysis" in
determining whether a braced firearm is subject to the NFA. 88 Fed. Reg. at 6502.
Those benefits more than justify any change in the agency's position, in part because
an agency's decision that a new interpretation is "more consistent with statutory
language" always "justif[ies] its policy choice." *Encino Motorcars, LLC v. Navarro*, 579
U.S. 211, 223-24 (2016) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158,
175 (2007)). Thus, the Rule more than satisfies the agency's obligation to "display
awareness that" the Rule reflects a shift in the agency's approach and to articulate
"good reasons for" the Rule's approach. *FCC v. Fox Television Stations, Inc.*, 556 U.S.
502, 515 (2009). That is all the APA demands.

**2.** In addition, the *Texas Gun Rights* district court briefly suggested that its
conclusion that the Rule is arbitrary and capricious was also supported by ATF's
posting on its website two slideshow presentations stating that certain braced firearms
constitute short-barreled rifles without adequate explanation. ROA.23-11204.336.
That suggestion is incorrect.

29

As an initial matter, the district court erred in determining that an injunction against the Rule could be based on a conclusion that the slideshows are arbitrary and capricious. As explained below, the slideshows themselves are not final agency action and are, in all events, reasonable. But even if the agency had committed error when it posted these PowerPoint presentations on its website, that would not justify the district court's conclusion that *the Rule* is unlawful or support the court's injunction against enforcement of the Rule. At most, the proper remedy—if the slideshows were properly challenged—would be to remand to the agency for further explanation or reconsideration.

And indeed, standing on their own, the slideshows do not represent reviewable final agency action. *See* 5 U.S.C. § 704. To be reviewable under the APA, agency action must be "the consummation of the agency's decisionmaking process" and an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation omitted). The slideshows themselves have no legal consequences. ATF made clear that the slideshows were posted to give notice and "inform members of the public of how they might be impacted" by future application of the Rule. 88 Fed. Reg. at 6514. And if ATF were to take enforcement action against a manufacturer or owner of any braced firearm shown in a slideshow, the question would be whether the firearm is a rifle, not whether the weapon was identified in the slideshow.

30

As the D.C. Circuit has explained, even if an agency document "unequivocally declares" the agency's "definitive interpretation" of a statute, the memorandum will be non-final if it "has no direct and appreciable legal consequences." *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637-38 (D.C. Cir. 2019). Like the memorandum at issue in that case, the slideshows here "ha[ve] no independent legal authority": no party may "rely on [them] as independently authoritative," and an entity that "refuses to comply" with the PowerPoint slideshows "faces no penalty or liability" for noncompliance with the slideshows' determinations. *Id.* Instead, an entity that disagrees with them may challenge the agency's interpretation, and receive judicial review of those challenges, in any future enforcement proceeding. *See id.* That renders the slides nonfinal.

In any event, the slideshow presentations' lack of substantial explanation is reasonable in context. The slides were issued contemporaneously with the Rule to provide advance notice to the regulated public of how the NFA applies to particular common braced firearms that ATF believes to be short-barreled rifles. Accordingly, the determinations in the slideshows are based on the framework of the Rule, including the Rule's emphasis on objective design features. *See* 88 Fed. Reg. 6514. And the slideshows are replete with examples of firearms equipped with stabilizing braces that are virtually identical to acknowledged short-barreled rifles with stocks. Indeed, perhaps for that reason, the district court nowhere suggested that any of the classifications were improper under the Rule's framework or that the reasons for the

31

classification could not be "reasonably . . . discerned" from the Rule. *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 520 (5th Cir. 2023) (quotation omitted).

## II.     The Equitable Factors Do Not Support Preliminary Relief

In ruling in plaintiffs' favor in *Mock*, the Court did not hold that plaintiffs had succeeded in demonstrating entitlement to a preliminary injunction. *Mock*, 75 F.4th at 586-88. Rather the Court directed the district court to consider whether the equitable factors weighed in favor of relief. The district courts in these four suits erred in concluding that plaintiffs have met the equitable requirements for the "extraordinary remedy" of an injunction. *Winter*, 555 U.S. at 24; *Anibowei v. Morgan*, 70 F.4th 898, 905 (5th Cir. 2023) (reaffirming that denial of a preliminary injunction is appropriate if "the movant has failed sufficiently to establish any one of the four criteria" (emphasis omitted) (quoting *Black Fire Fighters Ass'n of Dall. v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) (per curiam))).

### A.     Plaintiffs Face No Irreparable Harm

To substantiate irreparable harm, a plaintiff must at least show "a significant threat of injury from [an] impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Anibowei*, 70 F.4th at 902 (quoting *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986)). The mere possibility of injury is not enough; injury must be "likely." *Id.* (emphasis omitted) (quoting *Winter*, 555 U.S. at 22). No plaintiff here has met that bar.

As an initial matter, no plaintiff has shown that *the Rule* is the source of their alleged harm. It is "black letter law that an injunction will not issue when it would be ineffectual." *United States v. St. Bernard Par.*, 756 F.2d 1116, 1123 (5th Cir. 1985). As explained, well before the Rule, the NFA required that short-barreled rifles be taxed and registered; ATF had to determine whether braced firearms were short-barreled rifles; and ATF classified the "majority" of the braced firearms it assessed as short-barreled rifles. 88 Fed. Reg. at 6482, 6487, 6492 (quotation omitted).

Plaintiffs have not met their burden to provide evidence demonstrating that the Rule changed the legal status of the particular weapons that they possess or manufacture. *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff."). Plaintiffs have failed to substantiate any assertion that their braced firearms are not short-barreled rifles under the best understanding of the NFA, and nothing in the district courts' discussions on the merits—which all focused on perceived procedural flaws in the Rule—implies that the weapons plaintiffs possess or manufacture are *not* short-barreled rifles. Indeed, in many cases, plaintiffs have not identified their braced weapons at all. Accordingly, they cannot show that the Rule itself has caused them any irreparable harm such that a preliminary injunction against the Rule could redress any harm.

Regardless, each theory proffered by the individual plaintiffs and the corporate plaintiff, and accepted by the district courts, fails on its own merits.

*Individual Plaintiffs*: In concluding that the individual plaintiffs would suffer irreparable harm without a preliminary injunction, the *Mock* district court primarily concluded—in analysis reflected in the other district courts' later opinions—that the Rule would generate irreparable compliance costs by forcing plaintiffs to destroy braced firearms or braces that they possess. *See* ROA.23-11199.1094-98; *see also* ROA.23-11204.337-38; ROA.23-40685.1047-48; ROA.23-11203.1341-42. And the *Mock* and *Texas* district courts also asserted that the Rule irreparably harmed plaintiffs either by forcing them to comply with the NFA's requirements, ROA.23-40685.1048, or by exposing them to criminal prosecution if they choose not to comply, ROA.23-11199.1094-98. The *Mock* court further held that the individual plaintiffs would suffer an irreparable constitutional injury if the Rule were enforced, even though the court expressly declined to adjudicate the merits of plaintiffs' Second Amendment claim. *See* ROA.23-11199.1098-107; *see also* ROA.23-11204.337-38.

None of those purported harms can justify an injunction.

First, the district courts' statement that plaintiffs will be irreparably injured because they will be forced to destroy braces or firearms that they already possess to comply with the NFA ignores the text of the Rule. As explained, *see supra* p. 11, the Rule provided that individuals who possessed unregistered brace-equipped short-barreled rifles could register those firearms—without penalty or tax—by May 31, 2023. 88 Fed. Reg. at 6480-81. Thus, the Rule did not require plaintiffs to destroy any braces or firearms that they already possessed. And to the extent that plaintiffs in

these cases chose not to take advantage of the Rule's penalty-free registration period, any resulting harm is "self-inflicted" injury and "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (quoting *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995)).

Second, the Rule does not impose any cognizable compliance cost. To constitute irreparable harm, compliance costs must be "more than de minimis." *Restaurant Law Center v. Department of Labor*, 66 F.4th 593, 600 (5th Cir. 2023), and it is plaintiffs' burden to substantiate such harm. No plaintiff provided any evidence that the Rule—as opposed to the NFA—would impose them harm. And even the NFA's requirements are relatively modest: besides the $200 tax, the NFA requires that an individual who wishes to make or transfer a covered firearm must receive approval and register and mark the firearm. Such minor regulatory burdens are "merely 'additional costs and logistical hurdles' that all citizens bear as ancillary to living under a government." *Bezet*, 714 F. App'x at 340. Indeed, the only economic harm identified by the *Texas* district court associated with NFA compliance is the "$30 to $65" it may cost to engrave the firearm, ROA.23-40685.1048—an amount "so nominal as to be de minimis," *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976). In short, the burdens of regulatory compliance are not extraordinary and do not reflect harm so "certain and great and of such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)).

Separately, although the NFA requires that the maker or transferor of a covered firearm pay a $200 tax, that tax cannot constitute irreparable harm because it is remediable by a tax refund. An individual who pays the tax but believes the statute does not cover his weapon may request, or sue for, a refund. *See* 26 U.S.C. § 7422. That refund-suit remedy "offer[s a taxpayer] a full, albeit delayed, opportunity to litigate the legality" of a disputed tax. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 746 (1974). Such a "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Although the costs of complying with the NFA are minimal, the *Mock* district court nevertheless believed that the individual plaintiffs demonstrated the requisite irreparable harm based on a perceived threat of criminal prosecution if they chose not to comply with the statute. But it is undisputed that each plaintiff may continue to make, possess, and transfer short-barreled rifles—with no threat of criminal or civil liability—so long as they comply with the NFA's requirements. And plaintiffs cannot manufacture irreparable harm simply by choosing not to comply with minimally burdensome statutory requirements. Any such harm would again constitute "self-inflicted" injury that is not irreparable. *Texas*, 10 F.4th at 558.

Third, the individual plaintiffs may not establish an irreparable injury based on a constitutional claim. As explained, none of the district courts has held that plaintiffs

36

are likely to succeed on the merits of any constitutional claim. Indeed, to the contrary, the *Mock* court expressly disavowed any such holding. *See* ROA.23-11199.1105. Nevertheless, the court concluded that the "alleged violation [sic]" of a constitutional right—even if the absence of a likelihood of success on that claim—is sufficient to establish irreparable harm. ROA.23-11199.1098 (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295-97 (5th Cir. 2012)).

But the court's reliance on *Opulent Life* is misplaced. There, the plaintiff church developed substantial arguments that the defendant city's zoning ordinance violated its rights under the Religious Land Use and Institutionalized Persons Act, and this Court found that the "record [wa]s replete with evidence of irreparable harm to [the plaintiff's] ability to freely exercise its religion," including substantial evidence that the plaintiff's current (too-small) building was unable to accommodate "programs [the plaintiff] considers essential to its religious mission" and had "already prevented would-be members from joining." 697 F.3d at 296; *see also id.* at 288-94 (addressing the plaintiff's religious liberty arguments on the merits). Nothing in the holding of that case supports the remarkable proposition that any allegation of a constitutional violation—even if meritless—necessarily supports a finding of irreparable harm.

Moreover, this Court's precedents make clear that the mere "invocation" of a constitutional right "cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Rather, that showing may only be made where the impairment of a constitutional

right inflicts an immediate and significant real-world injury, as with limitations on the freedom of speech or conscience. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). And here, plaintiffs have identified no such injury—as explained, each individual plaintiff may continue to make, possess, and transfer braced short-barreled rifles so long as they comply with the NFA's relatively modest requirements. There is thus no risk of any immediate and significant injury to their Second Amendment right to keep and bear firearms for self-defense.

*Commercial Plaintiff.* The *Mock* district court also held that the commercial plaintiff—Maxim Defense—had established a likelihood of irreparable harm on the basis that it has experienced substantially reduced sales of braced firearms following the Rule, and, thus, its commercial existence is threatened. ROA.23-11199.1112-16. But that loss in sales does not constitute irreparable harm stemming from the Rule.

As an initial matter, the district court did not conclude that the Rule imposes substantial obligations or costs on Maxim directly (other than the modest costs of NFA compliance). And indeed, it is undisputed that Maxim—which appears to sell other products, such as firearm silencers, subject to the NFA—may continue to manufacture and sell braces and braced firearms so long as it similarly complies with the NFA's requirements for those products. Nevertheless, the district court found irreparable harm on the basis that Maxim's customers have reacted to the Rule by choosing to purchase fewer products. Such third-party effects do not support irreparable harm. To establish harm even in the standing context, a plaintiff must

show that its injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (plurality opinion) (alterations and quotation omitted). Making that showing is particularly challenging when an injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Id.* at 562 (quotation omitted). Here, neither ATF nor the Court has any ability to control the independent decisions of any potential customers to purchase or not purchase particular products. Any financial harm from those parties' choices is not irreparable harm tied to the Rule.

To the extent that the district court's conclusion of harm rests on the fact that plaintiffs' customers want to purchase stabilizing braces only (or principally) to circumvent the NFA, *cf.* ROA.23-11199.1112-16 (stating the braced firearm market "has evaporated" now that the firearms may be subject to the NFA), that suggestion only underscores ATF's determination that many of these "braces" are in fact manufactured for shoulder firing. Maxim cannot claim injury from a newfound inability to facilitate circumvention of law.

Moreover, the Rule makes clear that certain brace designs may reflect a firearm that is not intended to be fired from the shoulder. For example, a braced weapon might not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." 88 Fed. Reg. at 6529-30. Or it might include "a

feature intended specifically to prevent" shoulder firing, such as "a permanently attached protrusion." *Id.* at 6530. Accordingly, if Maxim has chosen not to manufacture such designs, any financial harm it has experienced from its customers' desire not to purchase short-barreled rifles is also self-inflicted. *Texas*, 10 F.4th at 558.

*Organizational Plaintiffs*: No district court here concluded that the organizational plaintiffs were injured—much less irreparably so—by the Rule. Instead, in each case with organizational plaintiffs, the court determined that plaintiffs had shown irreparable harm to their individual or commercial members. *See* ROA.23-11199.1107-16; ROA.23-11204.337-38; ROA.23-40685.1046. As explained, no individual or commercial entity has demonstrated any such irreparable harm traceable to the Rule, and the organizations thus have not shown any derivative or similar injury to their members.

## B.     The Balance of the Equities Favors Reversal

Even assuming plaintiffs had demonstrated some irreparable harm, their minimal asserted harms could not outweigh the countervailing public interest in public safety and in regulatory clarity.

**1.** As an initial matter, the Rule promotes regulatory clarity and consistency, as has been explained. *See supra* pp. 26-29. ATF's previous case-by-case "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6484 n.26, 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency

and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

Second, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. The Rule reinforces those controls that Congress deemed necessary for public safety by preventing circumvention of the requirements.

**2.** No district court seriously contested any of those substantial clarity and public-safety interests weighing in favor of continued implementation of the Rule. Instead, the *Mock* district court—in analysis adopted by the *Texas Gun Rights* and *Britto* courts—refused to consider those interests in the balancing at all, on the theory that any government and public-interest equities "evaporate" if plaintiffs are likely to succeed on the merits. ROA.23-11199.1116-17; *see also* ROA.23-11204.337-38; ROA.23-11203.1342-43.

But that conclusion rests on a fundamental misapplication of the preliminary injunction framework and calls into question this Court's decision in *Mock*, which recognized that to succeed "[t]here must be irreparable harm, and the balance of

equities and the public interest must favor injunctive relief." 75 F.4th at 586-87. The Court did not simply direct the district court to enter injunctive relief or to consider only whether there was sufficient irreparable harm. The Court's direction was instead consistent with Supreme Court precedent, which requires that plaintiffs demonstrate not only that they are "likely to succeed on the merits" but also that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. If the district courts' reasoning were correct, the consideration of equitable factors would collapse into one inquiry: any plaintiff who could establish a likelihood of success on the merits and irreparable harm would also establish that the balance of equities and the public interest tipped in his favor. That is not the law. *See id.* at 31-32 (declining to "address the underlying merits" but holding the plaintiffs had failed to meet the equitable factors).

Separately, the *Texas* district court believed that the equities weighed in favor of preliminary relief because it concluded that individuals' cost of compliance with the NFA was more "immediate and imminent" than were the harms to the government and the public from an injunction. ROA.23-40685.1049-50. That balancing is incorrect. For one, as is explained above, the costs of complying with the NFA are minimal—the only concrete cost that the *Texas* district court identified was the cost of engraving a firearm, which it found to be between $30 and $65. *See* ROA.23-40685.1047-48.

42

Conversely, the Rule provides substantial discussion of the concrete harms it seeks to prevent; for example, the Rule catalogues substantial public confusion and misunderstanding about application of the NFA to braced firearms and identifies many examples of regulated entities using braces to circumvent the NFA's requirements. *See supra* pp. 8-9, 28-29. And Congress has determined that proper enforcement of the NFA is essential to "public safety," *United States v. Freed*, 401 U.S. 601, 609 (1971), because the statutory requirements track the flow of the particularly dangerous firearms subject to the NFA to ensure that criminal, dangerous, or irresponsible individuals do not possess them. *See Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). And indeed, the Rule chronicles two recent mass shootings where the perpetrators reportedly employed short-barreled rifles constructed from stabilizing braces. *See* 88 Fed. Reg. at 6495. These harms are thus concrete, immediate harms that more than outweigh the minor compliance costs generated by the NFA.

## III. At a Minimum, This Court Should Reverse the District Courts' Overbroad Relief

Even setting aside the merits, each district court provided overbroad relief that should be reversed. Constitutional and equitable principles compelled each court to limit its relief to the specific named plaintiffs. The *Britto* court transgressed this limitation by entering a universal stay of the Rule. And the *Mock*, *Texas Gun Rights*, and

*Texas* district courts each erred by extending relief to unidentified members of the plaintiff organizations. This Court should reverse that overbroad relief.

### A.    The *Britto* Court Erred in Staying the Rule Universally

Although the plaintiffs in *Britto* consist only of three individuals, the *Britto* district court stayed the Rule nationwide under 5 U.S.C. § 705, which provides that a court reviewing agency action "may . . . postpone the effective date of an agency action" "to the extent necessary to prevent irreparable injury." *See* ROA.23-11203.1343. But fundamental constitutional and equitable principles—reflected in the text of § 705—preclude extending relief beyond the named plaintiffs. And in imposing its universal remedy, the district court failed to consider whether that relief, as opposed to more narrowly tailored relief, was required or was supported by the balance of equities and the public interest. That decision was erroneous and unexplained, and this Court should reverse the overbroad remedy.

**1.** Nationwide relief is never appropriate in a case, such as this one, where a tailored injunction would fully protect the interests of the named plaintiffs.

Article III "limits the exercise of the judicial power to 'Cases' and 'Controversies.'" *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017). Consistent with that limitation, a court may entertain a suit only by a plaintiff who has suffered a concrete injury and may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018) (quotation omitted).

Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And it is a longstanding principle of equity that, at most, injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring).

Those principles are buttressed here by the text and history of the APA. Section 705 itself permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, which explicitly incorporates the constitutional and equitable limitations on non-party relief. Indeed, the legislative history of that provision makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* And, more generally, the APA makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). The APA therefore requires courts to decline to enter nationwide relief, however styled, where other remedies would fully redress plaintiffs' injuries.

45

Nationwide relief—whether styled as an injunction or a stay—also creates well-catalogued legal and practical problems. Such relief circumvents the procedural rules governing class actions, which permit relief to absent parties only if rigorous safeguards are satisfied. Fed. R. Civ. P. 23. It enables forum shopping and empowers a single district judge to effectively nullify the decisions of all other lower courts by barring application of a challenged policy in any district nationwide. *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay). And it "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law" and overburdens courts' "emergency dockets." *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *see also United States v. Texas*, 599 U.S. 670, 702-04 (2023) (Gorsuch, J., concurring in the judgment).

**2.** In light of these principles, the *Britto* court's nationwide stay is improper. The *Britto* plaintiffs are three individuals "who possess what are likely to be [short-barred rifles] under" ATF's understanding of the NFA. *See* ROA.23-11203.1337. And the entirety of the irreparable harm that the district court found they would suffer absent relief consisted of the compliance costs that the individuals would incur if they complied with the NFA's requirements. *See* ROA.23-11203.1340-42. Even assuming those compliance costs could constitute irreparable harm, *but see supra* pp. 34-36, nationwide relief—as compared to tailored preliminary relief—does nothing more to ameliorate those asserted harms. A tailored preliminary injunction would ensure that

the individual plaintiffs need not comply with the NFA—and thus need not incur any compliance costs—for any braces that they make or possess. That is so regardless of whether ATF may continue applying the Rule's framework to other individuals or commercial entities. And, indeed, the district court nowhere considered the appropriate scope of relief or suggested that universal relief was required to redress plaintiffs' asserted injuries. In light of the availability of more narrowly tailored relief—whether a tailored stay under § 705 or a tailored preliminary injunction—a nationwide stay was therefore not necessary to redress the three individual plaintiffs' irreparable harm; the entry of that relief contravened both the fundamental principles described above and the text of § 705.

The *Britto* court's stay also embodies the practicable problems created by nationwide relief. A large number of additional plaintiffs beyond the three individuals in *Britto* have brought separate lawsuits raising similar claims against the Rule, with differing results. Even considering just this consolidated appeal, district courts have reached different conclusions considering the same rule. And beyond this appeal, two district courts in other circuits have denied motions for preliminary injunctions, the Eighth Circuit has denied a motion for an injunction pending appeal, and three additional cases remain pending in district court. *See Firearms Regulatory Accountability Coal., Inc. v. Garland*, No. 1:23-cv-024, 2023 WL 5942365 (D.N.D. Sept. 12, 2023) (denying preliminary injunction motion); Order, *Firearms Regulatory Accountability Coal., Inc. v. Garland*, No. 23-3230 (8th Cir. Jan. 2, 2024) (denying motion for injunction

pending appeal); *Miller v. Garland*, No. 1:23-cv-195, 2023 WL 3692841 (E.D. Va. May 26, 2023) (denying preliminary injunction motion), *appeal pending*, No. 23-1604 (4th Cir.); *see also Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *National Rifle Ass'n v. ATF*, No. 3:23-cv-1471 (N.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.) (all preliminary injunction motions pending in district court).

Different rulings of different courts should lead to different results. But the *Britto* court contravened this proposition, arrogating to itself the ability to award relief to losing plaintiffs in other cases before other courts. Because of the asymmetric nature of universal relief, the *Britto* court's nationwide stay has the effect of pretermitting those many other courts' consideration of similar issues by effectively awarding the plaintiffs in those cases the preliminary relief against the Rule that they seek. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) ("[Where] [o]ther courts are considering [the] same issues" at the same time, "[p]rinciples of judicial restraint control" and counsel against universal remedies.").

### B.     The *Mock*, *Texas Gun Rights*, and *Texas* District Courts Erred by Extending Relief to Unidentified Members of the Plaintiff Organizations

This Court should also reverse the district courts' extension of relief to unidentified members of the plaintiff organizations: in *Mock*, the members of the Firearms Policy Coalition, ROA.23-11199.1118; in *Texas Gun Rights*, the members of Texas Gun Rights and the National Association for Gun Rights, ROA.23-11204.276-79; and in *Texas*, the members of the Gun Owners of America, ROA.23-40685.1052.

In each case, the plaintiff organizations identified one or two individual members with standing to challenge the Rule. *See* ROA.23-11199.1107-10; ROA.23-11204.333; ROA.23-40685.1041-42. Each district court then permitted the organizations to leverage those one or two individual members to obtain relief not only for the identified members but also for hundreds of thousands, or indeed millions, of additional unknown members. These additional members have not been identified in court or agreed to be bound by any judgment—indeed, nothing suggests that they have given the organizations authority to litigate on their behalf or are even aware of these suits. The district courts' extension of relief to these unnamed members contravenes the fundamental constitutional and equitable principles described above and should be reversed.

As an initial matter, none of the four organizational plaintiffs have properly demonstrated that they have standing to litigate on behalf of their members as a whole because they have not shown that they are bona fide membership organizations. They have not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor have they explained how their members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997) (quotation omitted).

To the contrary, to the extent that the organizational plaintiffs have provided any substantial information about their structure and control, that information

suggests that plaintiffs are diffuse organizations whose purported "members" have no substantial ability to control the organizations' actions. For example, the Firearms Policy Coalition states that it "has hundreds of thousands of members across the country" and that any individual may join the organization by making a donation through its website. ROA.23-11199.472-73. Similarly, the Gun Owners of America states that it has "more than two million members and supporters," ROA.23-40685.584, and again any individual may join through a small donation on the organization's website, *see* Gun Owners of Am., *Membership*, https://donate.gunowners.org/join/ (last visited Jan. 22, 2024). And although the National Association for Gun Rights did not provide any information in district court about its members, its website suggests that it has 4.5 million members and that any individual likewise can join by making a donation online. *See* National Ass'n for Gun Rights, *Join National Association for Gun Rights*, https://nationalgunrights.org/join/?iteration=supportpage (last visited Jan. 22, 2024).

In short, although the plaintiff organizations label their donors and supporters as "members," nothing in the record suggests that is true; nor is there any reason to believe that the hundreds of thousands—or millions—of so-called "members" exercise any oversight or control of the organizations. Nor does anything in the record suggest that the organizations' "members" control—or are even aware of—this litigation that is purportedly on their behalf or that these individuals understand that they may be bound by any adverse judgment on their claims. In these

Case: 23-11199    Document: 35    Page: 58    Date Filed: 01/22/2024

circumstances, as this Court's commonsense rule articulated in *Friends of the Earth* makes clear, the organizational plaintiffs may not purport to litigate on behalf of all their many unidentified members.

Regardless, even if it were true that the plaintiff organizations could satisfy Article III's requirements to sue on behalf of their hundreds of thousands of members, equitable principles would compel forgoing relief to any member who has not been identified in district court and agreed to be bound by the judgment. Such a restriction on relief would promote longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

Those concerns are heightened in this context, where different large membership organizations have brought suits challenging the Rule in different venues. For example, the Second Amendment Foundation, which itself claims more than 650,000 members, unsuccessfully moved for a preliminary injunction against the Rule in a different suit consolidated in this appeal. *See* ROA.23-11157.22; ROA.23-11157.1193. And the National Rifle Association (NRA), which claims "millions" of members, has brought yet a different suit against the Rule where a motion for a preliminary injunction is pending. *See* Complaint ¶ 17, *NRA*, No. 3:23-cv-1471 (July 3, 2023); *see also* Motion for Preliminary Injunction, *NRA*, No. 3:23-cv-1471 (July 24, 2023).

To the extent that there is overlap between the collective asserted millions of members of the six different organizations litigating claims against the Rule across five different lawsuits, permitting each organizational plaintiff to litigate on behalf of all of its claimed members would allow improper duplication of individual members' claims. Such a result would improperly provide individual members of multiple organizations repeated bites at the apple, permitting them to obtain relief if only one organization's suit succeeds even if many others' suits fail. That scheme—embraced by the district courts—undermines basic principles of preclusion and perpetuates the unfair asymmetry those precepts seek to guard against.

# CONCLUSION

For the foregoing reasons, the orders of the district courts in *Mock*, *Texas*, *Texas Gun Rights*, and *Britto* should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

LEIGHA SIMONTON
ALAMDAR S. HAMDANI
  *United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

  *s/ Ben Lewis*
BEN LEWIS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7250*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2494*

January 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*s/ Ben Lewis*
Ben Lewis

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,520 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis

**ADDENDUM**

# TABLE OF CONTENTS

The Administrative Procedure Act

    5 U.S.C. § 702 ........................................................................................ A1

    5 U.S.C. § 704 ........................................................................................ A2

    5 U.S.C. § 705 ........................................................................................ A3

The National Firearms Act

    26 U.S.C. § 5801 .................................................................................... A4

    26 U.S.C. § 5802 .................................................................................... A5

    26 U.S.C. § 5811 .................................................................................... A6

    26 U.S.C. § 5812 .................................................................................... A7

    26 U.S.C. § 5821 .................................................................................... A8

    26 U.S.C. § 5822 .................................................................................... A9

    26 U.S.C. § 5841 .................................................................................... A10

    26 U.S.C. § 5845 .................................................................................... A11

Other Provisions of Title 26 of the U.S. Code

    26 U.S.C. § 7801 .................................................................................... A13

## The Administrative Procedure Act

**5 U.S.C. § 702**

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

**5 U.S.C. § 704**

**§ 704. Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

**5 U.S.C. § 705**

**§ 705. Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

# The National Firearms Act

**26 U.S.C. § 5801**

## § 5801. Imposition of tax

**(a) General rule.**—On 1ˢᵗ engaging in business and thereafter on or before July 1 of each year, every importer, manufacturer, and dealer in firearms shall pay a special (occupational) tax for each place of business at the following rates:

**(1)** Importers and manufacturers: $1,000 a year or fraction thereof.

**(2)** Dealers: $500 a year or fraction thereof.

**(b) Reduced rates of tax for small importers and manufacturers.—**

**(1) In general.**—Paragraph (1) of subsection (a) shall be applied by substituting "$500" for "$1,000" with respect to any taxpayer the gross receipts of which (for the most recent taxable year ending before the 1ˢᵗ day of the taxable period to which the tax imposed by subsection (a) relates) are less than $500,000.

**(2) Controlled group rules.**—All persons treated as 1 taxpayer under section 5061I(3) shall be treated as 1 taxpayer for purposes of paragraph (1).

**(3) Certain rules to apply.**—For purposes of paragraph (1), rules similar to the rules of subparagraphs (B) and (C) of section 448(c)(3) shall apply.

**26 U.S.C. § 5802**

## § 5802. Registration of importers, manufacturers, and dealers

On first engaging in business and thereafter on or before the first day of July of each year, each importer, manufacturer, and dealer in firearms shall register with the Secretary in each internal revenue district in which such business is to be carried on, his name, including any trade name, and the address of each location in the district where he will conduct such business. An individual required to register under this section shall include a photograph and fingerprints of the individual with the initial application. Where there is a change during the taxable year in the location of, or the trade name used in, such business, the importer, manufacturer, or dealer shall file an application with the Secretary to amend his registration. Firearms operations of an importer, manufacturer, or dealer may not be commenced at the new location or under a new trade name prior to approval by the Secretary of the application.

**26 U.S.C. § 5811**

**§ 5811. Transfer tax**

**(a) Rate.—**There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred, except, the transfer tax on any firearm classified as any other weapon under section 5845I shall be at the rate of $5 for each such firearm transferred.

**(b) By whom paid.—**The tax imposed by subsection (a) of this section shall be paid by the transferor.

**(c) Payment.—**The tax imposed by subsection (a) of this section shall be payable by the appropriate stamps prescribed for payment by the Secretary.

**26 U.S.C. § 5812**

**§ 5812. Transfers**

**(a) Application.**—A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; and (6) the application form shows that the Secretary has approved the transfer and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.

**(b) Transfer of possession.**—The transferee of a firearm shall not take possession of the firearm unless the Secretary has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section.

**5 U.S.C. § 5821**

**§ 5821. Making tax**

**(a) Rate.**—There shall be levied, collected, and paid upon the making of a firearm a tax at the rate of $200 for each firearm made.

**(b) By whom paid.**—The tax imposed by subsection (a) of this section shall be paid by the person making the firearm.

**(c) Payment.**—The tax imposed by subsection (a) of this section shall be payable by the stamp prescribed for payment by the Secretary.

**26 U.S.C. § 5822**

**§ 5822. Making**

No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

**26 U.S.C. § 5841**

**§ 5841. Registration of firearms**

**(a) Central registry.**—The Secretary shall maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States. This registry shall be known as the National Firearms Registration and Transfer Record. The registry shall include—

    **(1)** identification of the firearm;

    **(2)** date of registration; and

    **(3)** identification and address of person entitled to possession of the firearm.

**(b) By whom registered.**—Each manufacturer, importer, and maker shall register each firearm he manufactures, imports, or makes. Each firearm transferred shall be registered to the transferee by the transferor.

**(c) How registered.**—Each manufacturer shall notify the Secretary of the manufacture of a firearm in such manner as may by regulations be prescribed and such notification shall effect the registration of the firearm required by this section. Each importer, maker, and transferor of a firearm shall, prior to importing, making, or transferring a firearm, obtain authorization in such manner as required by this chapter or regulations issued thereunder to import, make, or transfer the firearm, and such authorization shall effect the registration of the firearm required by this section.

**(d) Firearms registered on effective date of this Act.**—A person shown as possessing a firearm by the records maintained by the Secretary pursuant to the National Firearms Act in force on the day immediately prior to the effective date of the National Firearms Act of 1968 shall be considered to have registered under this section the firearms in his possession which are disclosed by that record as being in his possession.

**(e) Proof of registration.**—A person possessing a firearm registered as required by this section shall retain proof of registration which shall be made available to the Secretary upon request.

**26 U.S.C. § 5845**

**§ 5845. Definitions**

For the purpose of this chapter—

**(a) Firearm.**—The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection I; (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

**(b) Machinegun.**—The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

**(c) Rifle.**—The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

**(d) Shotgun.**—The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.

**(e) Any other weapon.**—The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination

shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

***

**Other Provisions of Title 26 of the U.S. Code**

**26 U.S.C. § 7801**

**§ 7801. Authority of Department of the Treasury**

**(a) Powers and duties of Secretary.**--

**(1) In general.**--Except as otherwise expressly provided by law, the administration and enforcement of this title shall be performed by or under the supervision of the Secretary of the Treasury.

**(2) Administration and enforcement of certain provisions by Attorney General.**--

**(A) In general.**--The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General; and the term "Secretary" or "Secretary of the Treasury" shall, when applied to those provisions, mean the Attorney General; and the term "internal revenue officer" shall, when applied to those provisions, mean any officer of the Bureau of Alcohol, Tobacco, Firearms, and Explosives so designated by the Attorney General:

**(i)** Chapter 53.

**(ii)** Chapters 61 through 80, to the extent such chapters relate to the enforcement and administration of the provisions referred to in clause (i).

**(B) Use of existing rulings and interpretations.**--Nothing in the Homeland Security Act of 2002 alters or repeals the rulings and interpretations of the Bureau of Alcohol, Tobacco, and Firearms in effect on the effective date of such Act, which concern the provisions of this title referred to in subparagraph (A). The Attorney General shall consult with the Secretary to achieve uniformity and consistency in administering provisions under chapter 53 of title 26, United States Code.

A13

Case No. 23-11199

———————————————

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INCORPORATED, *a nonprofit corporation*; MAXIM DEFENSE INDUSTRIES, L.L.C.,

Plaintiffs-Appellees,

v.

MERRICK GARLAND, *U.S. Attorney General, in his official capacity as Attorney General of the United States*; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, *in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives*,

Defendants-Appellants

consolidated with

———————————————

Case No. 23-11203

———————————————

DARREN A. BRITTO; GABRIEL A. TAUSCHER; SHAWN M. KROLL,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendant-Appellant

consolidated with

———————————————

Case No. 23-11204

———————————————

TEXAS GUN RIGHTS, INCORPORATED; NATIONAL ASSOCIATION FOR GUN RIGHTS, INCORPORATED,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

Defendant-Appellant

consolidated with

———————————

Case No. 23-40685

———————————

STATE OF TEXAS; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION; BRADY BROWN,

Plaintiffs-Appellees,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; UNITED STATES DEPARTMENT OF JUSTICE; STEVEN M. DETTELBACH, *Director of ATF*,

Defendants- Appellants

———————————