No. 23-11199

# In the United States Court of Appeals for the Fifth Circuit

No. 23-11157

SECOND AMENDMENT FOUNDATION, INCORPORATED; RAINIER ARMS, L.L.C.; SAMUEL WALLEY; WILLIAM GREEN,

*Plaintiffs-Appellants*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity Director of the Bureau of Alcohol Tobacco Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK GARLAND, U.S. Attorney General,

*Defendants-Appellees*

consolidated with

*caption continued on following page*

On Appeal from
United States District Court for the Northern District of Texas, 4:23-cv-95-O

## BRIEF FOR APPELLEES IN *MOCK V. GARLAND*, No 23-11199

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
Telephone: (916) 517-1665
Facsimile: (916) 476-2392
cwi@fpchq.org

Bradley A. Benbrook
 *Counsel of Record*
Stephen M. Duvernay
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

*Counsel for Plaintiffs-Appellees*

No. 23-11199
WILLIAM T. MOCK; CHRISTOPHER LEWIS;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation;
MAXIM DEFENSE INDUSTRIES, L.L.C,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, U.S. Attorney General, in his official capacity as
Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES;
STEVE DETTELBACH, in his official capacity as the Director of the
Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants-Appellants*

consolidated with

No. 23-11203
DARREN A. BRITTO; GABRIEL A. TAUSCHER; SHAWN M. KROLL,

*Plaintiffs-Appellees*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*Defendant-Appellant*

consolidated with

No. 23-11204
TEXAS GUN RIGHTS, INCORPORATED;
NATIONAL ASSOCIATION FOR GUN RIGHTS, INCORPORATED,

*Plaintiffs-Appellees*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,

*Defendant-Appellant*

consolidated with

No. 23-40685

STATE OF TEXAS; GUN OWNERS OF AMERICA, INCORPORATED;
GUN OWNERS FOUNDATION; BRADY BROWN

*Plaintiffs-Appellees*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES
DEPARTMENT OF JUSTICE; STEVEN M. DETELBACH, Director of ATF,

*Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 23-11199

*William T. Mock, et al. v. Merrick Garland, et al.*

I certify that the following persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal:

1)    Plaintiffs-Appellees:

William T. Mock

Christopher Lewis

Maxim Defense Industries, LLC, a limited liability company, is a wholly-owned subsidiary of Maxim Defense Group, Inc., a Florida S-Corp. Maxim Defense Group, Inc., has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

Firearms Policy Coalition, Inc., a nonprofit corporation has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2)    Defendants-Appellants:

Merrick Garland, in his official capacity as Attorney General of the United States

United States Department of Justice

Steve Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

Bureau of Alcohol, Tobacco, Firearms and Explosives

3)    Counsel for Plaintiffs-Appellees:

BENBROOK LAW GROUP, P.C.
Bradley A. Benbrook
Stephen M. Duvernay

i

FPC ACTION FOUNDATION
Cody J. Wisniewski

COOPER & SCULLY PC
R. Brent Cooper
Nathan Curtis Flanigin

4) Counsel for Defendants-Appellants:

United States Department of Justice
Brian M. Boynton
Leigha Simonton
Alamdar S. Hamdani
Abby C. Wright
Sean R. Janda
Ben Lewis

5) *Amici Curiae*:
Palmetto State Armory LLC

Firearms Regulatory Accountability Coalition Inc.

NST Global LLC

6) Counsel for *Amici Curiae*:

WILEY REIN LLP
Stephen Joseph Obermeier
Michael D. Faucette
Jeremy J. Broggi
Boyd Garriott

JOHN LESLIE PLLC
John E. Leslie

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook
*Counsel of Record for*
*Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

The *Mock* Appellees agree with Appellants that the Court should decide this appeal with the benefit of oral argument as it did in the previous appeal in this matter. *Mock v. Garland*, No. 23-10319. The questions presented in these consolidated appeals are of critical importance: These cases concern not only the lawfulness of a regulatory action impacting millions of Americans, but also the appropriate scope of preliminary relief when a district court determines that a plaintiff is likely to succeed on the merits of a claim that a federal agency has violated the Administrative Procedure Act.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS............................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF AUTHORITIES ............................................................... v

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

STATEMENT OF THE CASE ............................................................. 8

A.    Statutory And Regulatory Background ......................................... 8

B.    Procedural History ......................................................... 16

STANDARD OF REVIEW................................................................ 21

ARGUMENT .......................................................................... 22

I.    The District Court Correctly Ruled That Plaintiffs Had Suffered, And Would Continue To Face, Irreparable Injury In The Absence Of Preliminary Injunctive Relief........................................................... 22

    A.    Maxim Defense ................................................... 24

    B.    Individual Plaintiffs ............................................. 28

    C.    Firearms Policy Coalition And Its Members ....................... 33

II.   The District Court Correctly Ruled That The Balance Of Equities Favored Preliminary Injunctive Relief From The Final Rule's Enforcement........... 35

III.  The District Court's Injunction Is Appropriately Tailored—And This Court Should Affirm *Britto*'s Universal Injunction ................................. 39

    A.    The District Court Properly Extended Injunctive Relief To FPC's Members ......................................................... 39

    B.    The Court Should Affirm *Britto*'s Universal Injunction Staying The Final Rule In Its Entirety................................................. 42

CONCLUSION ........................................................................ 50

CERTIFICATE OF SERVICE............................................................ 51

CERTIFICATE OF COMPLIANCE ...................................................... 52

# TABLE OF AUTHORITIES

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021) ....................................................................23

*All. for Hippocratic Med. v. FDA*,
78 F.4th 210 (5th Cir. 2023) .......................................20, 37, 38, 41

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......................................................34

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
875 F.2d 1174 (5th Cir. 1989) .......................................................23

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) ...................................................................22

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................4, 28

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*,
577 F.3d 250 (5th Cir. 2009) .........................................................35

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) .......................................................5, 31

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ...................................................................7, 45

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) (en banc) .........................................43

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981) ....................................................24, 31

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ...............................................................4, 28

*District of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020) .......................................43, 44, 49

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2020) .........................................................34

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................31

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) .........................................................30

*Feds for Med. Freedom v. Biden*,
63 F.4th 366 (5th Cir. 2023) (en banc) ................................. passim

v

*Franciscan All., Inc. v. Burwell,*
227 F. Supp. 3d 660 (N.D. Tex. 2016) ...............................................43

*Friends of the Earth, Inc. v. Chevron Chem. Co.,*
129 F.3d 826 (5th Cir. 1997) ............................................................39

*Google, Inc. v. Hood,*
822 F.3d 212 (5th Cir. 2016) ............................................................32

*Humana, Inc. v. Jacobson,*
804 F.2d 1390 (5th Cir. 1986) ..........................................................22

*Hunt v. Wash. State Apple Advertising Comm'n,*
432 U.S. 333 (1977)..........................................................................40

*Janvey v. Alguire,*
647 F.3d 585 (5th Cir. 2011) ............................................................23

*K.P. v. LeBlanc,*
627 F.3d 115 (5th Cir. 2010) ............................................................28

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016)..............................................................38

*Louisiana v. Biden,*
55 F.4th 1017 (5th Cir. 2022) ..........................................6, 21, 30, 36

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)..........................................................................28

*Mock v. Garland,*
666 F. Supp. 3d 633 (N.D. Tex. 2023) ..............................................16

*Mock v. Garland,*
75 F.4th 563 (5th Cir. 2023) ....................................................... passim

*N. Carolina State Conf. of the NAACP v. Raymond,*
981 F.3d 295 (4th Cir. 2020) ............................................................34

*N. Mariana Islands v. United States,*
686 F. Supp. 2d 7 (D.D.C. 2009) ......................................................36

*Nat'l Fed'n of Indep. Bus. v. Perez,*
No. 16-cv-00066, 2016 WL 3766121 (N.D. Tex. June 27, 2016) ...............43, 46

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998) ........................................................43

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
886 F.3d 803 (9th Cir. 2018) ............................................................34

*NetChoice, LLC v. Paxton,*
573 F. Supp. 3d 1092 (W.D. Tex. 2021)............................................41

vi

*Nevada v. United States Department of Labor,*
   218 F. Supp. 3d 520 (E.D. Tex. 2016) ...................................................45

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1 (2022)...................................................................................31

*Nken v. Holder,*
   556 U.S. 418 (2009)...............................................................................21

*Open Communities All. v. Carson,*
   286 F. Supp. 3d 148 (D.D.C. 2017) ..................................................6, 20

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) ................................................................31

*Prof. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.,*
   730 F.2d 258 (5th Cir. 1984) ................................................................46

*R.J. Reynolds Vapor Co. v. Food & Drug Admin.,*
   65 F.4th 182 (5th Cir. 2023) ......................................................... passim

*Rai v. Biden,*
   567 F. Supp. 3d 180 (D.D.C. 2021) ......................................................44

*Rest. L. Ctr. v. United States Dep't of Lab.,*
   66 F.4th 593 (5th Cir. 2023) ...........................................................27, 30

*Sierra Club v. Trump,*
   963 F.3d 874 (9th Cir. 2020) ................................................................34

*State v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ............................................................6, 36

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*
   600 U.S. 181 (2023)...........................................................................7, 40

*Sugar Cane Growers Co-op. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ...............................................................44

*Texas All. for Retired Americans v. Scott,*
   28 F.4th 669 (5th Cir. 2022) ................................................................21

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n,*
   989 F.3d 368 (5th Cir. 2021) ................................................................41

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) ................................................................28

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ........................................................ passim

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex. 2016) .................................................46

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) ..............................................6, 7, 36, 39

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ........................................................46

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ....................................................................23

*United Food & Commercial Workers Union v Brown Group. Inc.*,
  517 U.S. 544 (1996)......................................................................41

*VanDerStok v. BlackHawk Mfg. Grp. Inc.*,
  639 F. Supp. 3d 722 (2022) ......................................................37, 38

*VanDerStok v. Garland*,
  633 F. Supp. 3d 847 (N.D. Tex. 2022) ........................................19, 30

*VanDerStok v. Garland*,
  86 F.4th 179 (5th Cir. 2023) ...........................................................1

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) ...................................................passim

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  485 F. Supp. 3d 1 (D.D.C. 2020) ....................................................44

**Statutes**

18 U.S.C. § 921(a)(30) ........................................................................9, 10

18 U.S.C. § 921(a)(7) ................................................................................9

26 U.S.C. § 5845(a)(3)-(4) .......................................................................9

26 U.S.C. § 5845(a)(3)-(4), (e) ................................................................9

26 U.S.C. § 5845(c) ..................................................................................9

26 U.S.C. § 5845(e) ..................................................................................9

26 U.S.C. §§ 5811, 5812 ..........................................................................9

5 U.S.C. § 702 ........................................................................................23

5 U.S.C. § 705 ........................................................................................42

5 U.S.C. § 706 ........................................................................................43

**Other Authorities**

Letter from John R. Spencer, Firearms Tech. Branch Chief, U.S. Dep't of Just.,
  Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov.
  26, 2012) ..............................................................................................12

Mila Sohoni, *The Power to Vacate a Rule*,
  88 GEO. WASH. L. REV. 1121 (2020) ..................................................45

U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014), https://tinyurl.com/mr3esfhu ..................................................................10

**Regulations**

Factoring Criteria for Firearms with Attached 'Stabilizing Braces', 86 Fed. Reg. 30,826 (June 10, 2021)......................................................................................2, 10

Factoring Criteria for Firearms with Attached Stabilizing Braces, 88 Fed. Reg. 6,478 (Jan. 31, 2023).................................................................................. passim

**Constitutional Provisions**

U.S. Const. Art. III, § 1 ............................................................................................46

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since 2012, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") consistently advised gun owners that pistols equipped with stabilizing braces were not "short-barreled rifles" that had to be registered under the National Firearms Act ("NFA"). In 2022, ATF issued a Final Rule that suddenly purported to turn 99% of the more than 3 million braced pistols in America into NFA-regulated rifles—and turn otherwise-law-abiding owners of such braced pistols into felons if they didn't destroy the braced pistols, surrender them to the ATF, or submit to the NFA's onerous regulations.[1] "ATF cannot legislate," however, so Plaintiffs brought this case to stop this abuse. *VanDerStok v. Garland*, 86 F.4th 179, 192 (5th Cir. 2023).

In a previous appeal, this Court catalogued many reasons why the Final Rule cannot stand: It "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023). The Final Rule's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace," *id.* at 585, such that "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol," *id.* at 584. The Court found that ATF and the Department

---

[1] Factoring Criteria for Firearms with Attached Stabilizing Braces (the "Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023).

of Justice ("DOJ") (collectively, the "Agencies") violated the APA's procedural requirements for notice and comment because the Final Rule was not a logical outgrowth of the Proposed Rule.[2] *Id.* at 583–86.

As a result, the Court held that Plaintiffs are likely to succeed on the merits of their APA claim and remanded the case with a direction that the district court adjudicate the remaining preliminary-injunction factors and consider the appropriate scope of an injunction. *Id.* at 586–88. On remand, the district court held that each of the preliminary injunction factors weighed in favor of granting a preliminary injunction. ROA.23-11199.1083. The court issued a preliminary injunction enjoining the Agencies from enforcing the Final Rule against the individual Plaintiffs and their family members; Maxim Defense and all of its downstream customers (including all direct consumer purchasers and all intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense, as well as their customers); and all of Plaintiff Firearms Policy Coalition's members. ROA.23-11199.1119-1120.

The Agencies' appeal in this case focuses on the district court's evaluation of the preliminary injunction factors and the scope of its injunction order. The opinion below was correct and should be affirmed.

---

[2] Factoring Criteria for Firearms with Attached 'Stabilizing Braces' ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).

*Irreparable Harm*. The district court correctly held that Plaintiffs established irreparable harm under multiple independent lines of authority. First, Maxim Defense has suffered—and in the absence of an injunction, would continue to suffer—"substantial financial injury" that "threatens the very existence of [its] business." *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) (quoting *Texas v. EPA*, 829 F.3d 405, 433, 434 (5th Cir. 2016)). This harm is compounded because the Agencies' sovereign immunity prevents Maxim Defense from recovering monetary damages for the Final Rule's devastating financial impact. *See id.* This was not a close call: The market for stabilizing braces and pistols with stabilizing braces essentially evaporated because of the Final Rule. Maxim Defense documented millions of dollars in unrecoverable losses throughout the proceedings below.

The Agencies respond that a "loss in sales" is insufficient to constitute irreparable harm. But this cannot be squared with this Court's decisions holding that a company's severe economic injury tied to a regulatory rule is a paradigmatic form of irreparable harm. Nor can the government escape the Final Rule's impact on Maxim Defense by claiming that its financial injury was due to customers' choices, and not the threat of enforcement. The company's harm is directly tied to the predictable effect of coercive government action through the Final Rule. *See Dep't*

3

*of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019); *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

So too have the individual Plaintiffs and the members of Firearms Policy Coalition ("FPC") been irreparably harmed. Plaintiffs Mock and Lewis, themselves FPC members, detailed the burden imposed by the Final Rule, including the sort of nonrecoverable compliance costs that "almost *always*" constitute "irreparable harm" in this context. *Texas v. EPA*, 829 F.3d at 433 (citation omitted). And individuals' options for "compliance" with the Final Rule—namely, destroying or surrendering their braced pistols or stabilizing braces or spending time and money to register their braced pistols under the NFA[3]—constitute classic forms of irreparable harm.

The Agencies claim that this harm is "de minimis," but the district court cited the ATF's own evidence showing average compliance costs ranging from $270 to $2,500 or more. These are real and significant nonrecoverable costs to individuals subject to the Final Rule's regulation. The Agencies further argue that having to choose whether to pay the fee or to destroy or surrender braced pistols is "self-inflicted" harm because owners of braced pistols should have just complied with the Final Rule. This circular argument improperly presumes the Final Rule is lawful, which this Court has rejected; moreover, it ignores that the Final Rule imposed a

---

[3] An avenue which, notably, is no longer open to individuals upon the expiration of the Final Rule's 120-day non-enforcement period. *See* Final Rule, 88 Fed. Reg. at 6.481.

retroactive change of the Agencies' decade-long regulatory position on braced pistols.

Furthermore, the district court correctly observed that the Final Rule threatens to inflict irreparable harm on Plaintiffs' Second Amendment protected rights. ROA.23-11199.1098-1107. This is consistent with this Court's longstanding recognition that the threatened deprivation of constitutional rights constitutes irreparable injury. *See, e.g.*, *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (holding that "the loss of constitutional freedoms 'for even minimal periods of time . . . unquestionably constitutes irreparable injury'") (citation omitted). As the district court put it, the individual Plaintiffs "and thousands of other FPC member-firearm owners have been relegated to either suffer the irrecoverable and constitutionally burdensome costs of compliance with the unlawful Final Rule, 'or else' run the risk of criminal prosecution and imprisonment for engaging in the fundamental right to keep and bear arms for lawful self-defense purposes." ROA.23-11199.1109; *see also Mock*, 75 F.4th at 588 (Willett, J., concurring) (observing that the Final Rule "would likely fail constitutional muster" under the Second Amendment).

*Equitable Factors*. The district court correctly ruled that the balance of equities and public interest—which "merge when the Government is the opposing party," *Mock*, 75 F.4th at 577—both favored injunctive relief. As this Court has

repeatedly held, the public has a strong interest in ensuring the federal government acts within lawful bounds. "It is of highest public importance that federal agencies follow the law." *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 195 (5th Cir. 2023); *see also Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (noting the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation and quotations omitted)). And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quoting *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021)).

The Agencies, on the other hand, suffer no harm from an injunction that maintains the decade-long status quo regarding what constitutes a "rifle" until the Final Rule is struck down on the merits. The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citation omitted).

So while the Agencies argue that the court failed to adequately weigh the government's interest in regulatory "clarity," that cannot be squared either with this Court's ruling on the merits of the APA challenge (which confirmed that the Final Rule provides little guidance to the regulated community), or with its repeated statements that the public interest favors holding the government to its legal obligations and that the government does not suffer any appreciable harm from an

injunction ending unlawful agency action. *See*, *e.g.*, *Texas v. United States*, 40 F.4th at 229. Likewise, the Agencies' passing argument that public safety concerns weigh against a preliminary injunction carry little value since preliminary relief only maintains the preexisting status quo—extending over a decade—where ATF maintained that stabilizing braces and braced pistols were *not* subject to regulation under the NFA.

The equitable factors decisively fall in Plaintiffs' favor.

*Scope of Injunction*. Finally, the district court appropriately exercised its discretion in fashioning injunctive relief, which prevents enforcement of the Final Rule against the individual Plaintiffs and their family members; Maxim Defense and all of its downstream customers; and all of FPC's members. This injunction is the bare minimum to "provide complete relief" to Plaintiffs here. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Agencies' only response is to question FPC's standing with an argument that was decisively rejected by the Supreme Court last term in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199–201 (2023). Under the governing test, there is no doubt that FPC has standing to seek relief on behalf of its members, which include the individual Plaintiffs and Maxim Defense.

Indeed, the district court would have been justified in issuing a universal injunction preventing the Agencies from enforcing the Final Rule in its entirety

given the nationwide reach of the Agencies' overreach, the nationwide scope of the Plaintiffs' operations, and the integrated nature of the already-heavily-regulated firearms market. *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc). To that end, the Court should affirm the preliminary injunction entered in *Britto v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 23-11203, or, at minimum, that entered below.

*    *    *

In sum, the district court correctly evaluated the irreparable-harm, balance-of-harms, and public-interest factors, which all weighed strongly in Plaintiffs' favor. The Court should affirm the district court's preliminary injunction ruling, and enter a universal injunction that prevents the Agencies from enforcing the Final Rule.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background.

This Court is familiar with the statutory and regulatory background giving rise to this litigation, which has been recounted extensively in litigation over Plaintiffs' motion for preliminary injunction. *Mock*, 75 F.4th at 567–77; *see also* ROA.23-11199.1083-1088. Plaintiffs briefly restate that background here.

The National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified at 26 U.S.C. § 5801 et seq.) and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ("GCA") (codified as amended at 18 U.S.C. § 921 et seq.),

8

treat handguns and pistols—which the GCA defines as firearms with "a short stock" designed to be fired with one hand, 18 U.S.C. § 921(a)(30)—differently from rifles, which are "designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Pistols and handguns are not subject to the more onerous obligations and requirements of the NFA, but many rifles are. 26 U.S.C. § 5845(a)(3)-(4), (e).

The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, transfer, and lawful use of the arms it regulates. 26 U.S.C. §§ 5811 ($200 tax), 5812 (other burdens).[4] Pistols are expressly excluded from NFA restrictions and obligations. 26 U.S.C. § 5845(e). Short-barreled rifles ("SBRs"), however, are covered by the NFA. *Id.* § 5845(a)(3)-(4).

An SBR is an NFA-regulated "firearm" defined as "a rifle having a barrel or barrels of less than 16 inches in length; [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[.]" *Id.* A "rifle" is defined by the NFA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). Though "pistol" is not defined in the NFA, the GCA defines a

---

[4] Such firearms cannot be transferred or possessed, for example, without first obtaining approval from the Secretary of the ATF. NFA-registered firearms are also subject to limits on travel and must be stored differently than other firearms as a matter of federal law.

"handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30).

This case involves the Agencies' attempt to reclassify NFA-exempt braced pistols as NFA-restricted SBRs. Stabilizing braces assist all people, including those having disabilities or limited strength or mobility, with the safe and comfortable one-handed firing of pistols.[5] As explained in the patent for the original stabilizing brace, stabilizing braces do so by attaching to a pistol on one end and wrapping around the wrist or forearm on the other end to "permit[] a user to handle and support a handgun without straining the user's arm, hand, or wrist" by "more evenly distribut[ing]" the weight of the handgun "through the user's hand, wrist, and forearm."[6] Braced pistols are thus *designed* to be fired with one hand—and the patent illustrates the way that braced pistols attach to the forearm.[7]

---

[5] Proposed Rule, 86 Fed. Reg. at 30,827 ("[T]he brace concept was inspired by the needs of combat veterans with disabilities who still enjoy recreational shooting but could not reliably control heavy pistols without assistance."); *see also Mock*, 75 F.4th at 566 ("The stabilizing brace was intended to attach to the forearm and, according to the licensee, to permit disabled and weaker persons to fire pistols more easily."); *id.* at 571 (when SB Tactical first submitted its stabilizing brace to the ATF in 2012, it explained "that the brace was designed so that disabled persons could fire heavy pistols more safely and comfortably").

[6] *See* U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014), https://tinyurl.com/mr3esfhu.

[7] *Id.* at figs. 1, 2 & 3.



FIG. 1

FIG. 2          FIG. 3

The Final Rule itself demonstrates that stabilizing braces facilitate more secure firing with one hand with these images.[8]



2012 submission of original "stabilizing brace" attached to an AR-type pistol

---

[8] Final Rule, 88 Fed. Reg. at 6,483.

11

Prior to the issuance of the Final Rule, ATF did not regulate braced pistols as NFA-regulated SBRs. To the contrary, in 2012, ATF issued a letter ruling in response to the question whether the addition of a brace "would convert a firearm in a manner that would cause it to be classified as a 'rifle' and thus a 'firearm'" under the NFA. Letter from John R. Spencer, Firearms Tech. Branch Chief, U.S. Dep't of Just., Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov. 26, 2012), https://tinyurl.com/2z7pz2v6. ATF determined that "the submitted forearm brace, when attached to a firearm, does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm." *Id*. This ruling reinforced the widespread understanding that stabilizing braces do not subject pistols to NFA regulation. ATF reiterated similar guidance in 2015 and 2017, *see Mock*, 75 F.3d at 571–72. And in 2019, "ATF asserted in criminal prosecutions that 'ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA.'" *Id*. at 572 (citing Sentencing Hr'g Tr. at 38, *United States v. Kamali*, No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF No. 110).

12

The Agencies' Final Rule upended this regime, however, and attempted to erase the line between a non-NFA braced pistol and an NFA-regulated SBR.[9] The Final Rule amended the federal regulatory definitions of "rifle" to include an indeterminate, open-ended, six-factor test for deciding whether a braced pistol was designed and intended to be fired from the shoulder, and thus was an NFA-regulated "rifle." Final Rule, 88 Fed. Reg. at 6,574–75. Those factors are:

> (i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (ii) Whether the weapon has a length of pull,[10] measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
>
> (iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
>
> (iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other

---

[9] Reclassifying a pistol as a rifle would likely create a "short-barreled" rifle since pistols typically have barrels less than 16 inches long. Thus, as ATF itself noted, "approximately 99% of pistols with stabilizing braces" would be classified as "rifles" under the Final Rule. *Mock*, 75 F.4th at 574 (citation omitted).

[10] The "length of pull" is the distance between the trigger to the butt of the firearm.

accessory, component, or other rearward attachment that is necessary for the cycle of operations[11];

(v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) Information demonstrating the likely use of the weapon in the general community.

*Id.* The Final Rule also listed several pages of firearms that may be covered if they are configured with a stabilizing brace.[12]

Under the Final Rule, the only difference between an NFA-regulated SBR and an NFA-exempt pistol is the addition of the stabilizing brace or any other item that the Agencies believe could serve a similar function. The images below, for example, are both NFA-exempt pistols that have short stocks and are "designed to be held and fired by the use of a single hand"—even under the Final Rule. 18 U.S.C. § 921(a)(30). But once configured with (or even merely possessed alongside) a brace (or anything that could serve as one), the Final Rule treats both as SBRs even though the brace exists specifically to facilitate single-handed firing.

---

[11] The "cycle of operations" is the process taken "to expel a projectile by the action of an explosive." Final Rule, 88 Fed. Reg. at 6,485. A buffer tube, like that included in the image *infra*, at 15, on the right, is necessary for the cycle of operations for that firearm.

[12] *Id.* at 6,514–18, 6,535–37.



By contrast, a rifle is designed and intended to be fired with two hands; the firearm is stabilized by resting the stock on the rear of the firearm against the shoulder and holding the second hand in front of the trigger.

In short, despite having advised the public for a decade that braced pistols were not SBRs under the NFA, the Final Rule announced that, under its new definition of an SBR, 99% of the 3 million braced pistols in America—and potentially millions of other pistols that might be combined with a formal or informal "brace"—would now be considered SBRs that immediately became subject to the NFA's harsh restrictions. *See Mock*, 75 F.4th at 572 ("As of 2023, the ATF estimates there are about 3 million pistol braces in circulation (with 7 million at the high end).") (citing ATF, RIN 1140-AA55, Factoring Criteria for Firearms with Attached "Stabilizing Braces": Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis 18 (2023)). And ATF itself confirmed "that approximately 99% of pistols with stabilizing braces would be classified as [SBRs]" under the Final Rule. *Id.* at 574.

15

Furthermore, under the Final Rule, the Agencies now consider it unlawful for pistol owners to possess *any* item that could serve as a brace (or stock) under the discretionary, non-exhaustive six-factor test, even if not actually attached to a pistol, given the risk of being charged with constructive possession of an unregistered SBR. The Final Rule thus effectively regulates all arms with a barrel of less than 16 inches to which one could theoretically attach a homemade brace constructed from common household items, or any other device that the Agencies deem to meet their new, indeterminate test. The Final Rule went into effect upon publication for everyone— including manufacturers and dealers—but the Agencies chose not to enforce it for 120 days for individual gun owners. Final Rule, 88 Fed. Reg. at 6,478, 6,553. That grace period has since expired.

## B.    Procedural History.

Plaintiffs sued the Agencies the same day the Agencies published the Final Rule. ROA.23-11199.21. Plaintiffs filed an Amended Petition seven days later, ROA.23-11199.139, and promptly sought a preliminary injunction or a stay of the rule under 5 U.S.C. § 705 (or both), ROA.23-11199.415. The district court denied Plaintiffs' motion on March 30, 2023. ROA.23-11199.569, *Mock v. Garland*, 666 F. Supp. 3d 633 (N.D. Tex. 2023).

On August 1, 2023, this Court reversed, holding that Plaintiffs had established a likelihood of prevailing on their claim that the Final Rule failed the APA's logical-

outgrowth test. *Mock*, 75 F.4th at 578–86. The Court then remanded the case and directed the district court to consider the remaining preliminary injunction factors and the appropriate scope of relief. *Id.* at 586–88.

On remand, the district court ordered further briefing and issued an order granting Plaintiffs' motion for a preliminary injunction, which is the subject of this appeal. ROA.23-11199.1083.

The district court first held that the individual Plaintiffs (William Mock and Christopher Lewis), and the members of Plaintiff Firearms Policy Coalition, were threatened with two "intertwined" types of irreparable harm: "(i) sustaining permanent and nonrecoverable costs from their compliance with an unlawfully issued regulation; and (ii) suffering impairment of their fundamental right to keep and bear lawful arms in self-defense." ROA.23-11199.1094-1098.

The court found that Plaintiffs Mock and Lewis "ha[d] no trouble" establishing irreparable harm based on the "permanent and nonrecoverable costs from their compliance with an unlawfully issued regulation." ROA.23-11199.1096-1098. The court explained that "financial harm from regulatory compliance becomes irreparable where a plaintiff cannot recoup money damages from a federal agency on account of its sovereign immunity." ROA.23-11199.1096; *see* ROA.23-11199.1097-1098 (citing evidence from ATF that compliance costs range from $270 to "$2,500 or more").

17

In addition, the district court held that the Final Rule "substantially threatens to inflict irreparable constitutional harm" by impairing Second Amendment protected rights. ROA.23-11199.1098-1107. "The situation becomes far more dire for the FPC members in the absence of the Court's intervening protection when one considers the burden the Final Rule threatens to impose on their fundamental right to keep and bear arms in self-defense." ROA.23-11199.1098. As the court explained, "[a]bsent injunctive relief, the Final Rule will impair and threaten to deprive them of their fundamental right to keep and bear commonly used arms as a means of achieving the inherently lawful ends of self-defense." ROA.23-11199.1099. And because "[o]nce infringement of a fundamental right has occurred, 'it cannot be undone,'" Plaintiffs were "substantially threatened with irreversible constitutional infringement." ROA.23-11199.1107 (citation omitted).

The court then determined, "based on an evaluation of the 'whole record' of the ATF's promulgation of the Final Rule," that the hundreds of thousands of individual members of Plaintiff Firearms Policy Coalition similarly situated to the individual Plaintiffs likewise "cleared the threat-of-irreparable-harm hurdle by a safe margin." ROA.23-11199.1107-1110. Specifically, the individual Plaintiffs "and thousands of other FPC member-firearm owners have been relegated to either suffer the irrecoverable and constitutionally burdensome costs of compliance with the unlawful Final Rule, 'or else' run the risk of criminal prosecution and imprisonment

for engaging in the fundamental right to keep and bear arms for lawful self-defense purposes." ROA.23-11199.1109-1110 (quoting *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 857 (N.D. Tex. 2022)).

Turning to Maxim Defense, the district court held that the Final Rule's devastating financial impact inflicted irreparable harm in two distinct ways. ROA.23-11199.1110-1116. As with the individual Plaintiffs, Maxim Defense suffered nonrecoverable compliance costs based on the Agencies' sovereign immunity. ROA.23-11199.1112-1115. The court reviewed Maxim Defense's evidence documenting millions of dollars in losses because the Final Rule destroyed each of the channels of commerce the company relied on to sell stabilizing braces and braced pistols. ROA.23-11199.1113-1114. "None of these exorbitant compliance costs are recoupable" because of sovereign immunity, and "it is 'no answer' for the Government Defendants to say that Maxim Defense can protect its business by 'simply complying' with the unlawful Final Rule during the interim of this suit." ROA.23-11199.1114.

Second, the court held that Maxim Defense faced irreparable harm based on "substantial financial injury" that threatened the "very existence" of the company's business. ROA.23-11199.1115-1116. (quoting *Wages & White Lion*, 16 F.4th at 1142). This was not a close call, given the multi-million-dollar losses Maxim Defense documented in the proceedings below. Put simply, the Final Rule threatened

19

Maxim Defense "with existential financial ruin in the immediate instant without" injunctive relief. ROA.23-11199.1115. As the court put it, Maxim Defense had "little difficulty" establishing irreparable harm—it cleared the legal standard "by a wide margin." ROA.23-11199.1115.

The district court then found that the remaining preliminary injunction factors each favored Plaintiffs. Specifically, the court observed that "there can be '*no* public interest in the perpetuation of unlawful agency action,'" and "[a]s it relates to enforcement of the Final Rule against Plaintiffs, 'neither [the Government Defendants] nor the public has *any* interest in enforcing a regulation that violates federal law.'" ROA.23-11199.1116 (quoting *Louisiana v. Biden*, 55 F.4th at 1035, and *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 251 (5th Cir. 2023) (emphasis supplied by the district court)). And because this Court already concluded that "the Final Rule 'fails the logical-outgrowth test and violates the APA' and 'therefore must be set aside as unlawful,'" "there is *no* injury that the Government Defendants or public at-large could possibly suffer from if enforcement of the Final Rule were enjoined." ROA.23-11199.1117 (quoting *Mock*, 75 F.4th at 578, 583–86, and citing *Open Communities All.*, 286 F. Supp. 3d at 179, for the proposition that "[t]he [government] defendants . . . cannot suffer harm from an injunction that merely ends an unlawful practice").

Turning to the scope of relief: The court issued a preliminary injunction enjoining the Agencies from enforcing the Final Rule against the individual Plaintiffs and their family members; Maxim Defense and all of its downstream customers (including all direct consumer purchasers and all intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense, as well as their customers); and all of Plaintiff Firearm Policy Coalition's members. ROA.23-11199.1119-1120.

## STANDARD OF REVIEW

This Court reviews a preliminary injunction for an abuse of discretion, factual findings for clear error, and legal conclusions de novo. *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). "To obtain . . . a preliminary injunction, a movant must show: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest." *Louisiana v. Biden*, 55 F.4th at 1022 (internal citations omitted). "The government's and the public's interests merge when the government is a party." *Mock*, 75 F.4th at 577 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

Given this Court's previous decision holding that Plaintiffs are likely to succeed on the merits of their APA challenge, this appeal is limited to the remaining preliminary-injunction factors and the scope of relief.

## I.   The District Court Correctly Ruled That Plaintiffs Had Suffered, And Would Continue To Face, Irreparable Injury In The Absence Of Preliminary Injunctive Relief.

This Court's decisions confirm that Plaintiffs established that they would suffer irreparable injury if an injunction was not issued. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, a movant must only show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).

The district court correctly held that Plaintiffs established irreparable harm under three independent lines of authority. First, this Court has consistently held that "substantial financial injury" may be "sufficient to show irreparable injury" in the APA context, particularly where financial costs "threaten[] the very existence of [a plaintiff's] business." *Wages & White Lion*, 16 F.4th at 1142 (quoting *Texas v. EPA*, 829 F.3d at 433, 434); *see also R.J. Reynolds Vapor Co.*, 65 F.4th at 194 (same); *accord Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174,

1179 (5th Cir. 1989) (recognizing that economic loss is irreparable when it "is so great as to threaten the existence of the movant's business").

Second, "harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). This Court has long recognized that financial harm is irreparable where, as here, Plaintiffs cannot recover damages from a federal agency due to sovereign immunity. *Wages & White Lion*, 16 F.4th at 1142 (holding that unrecoverable costs are irreparable harm "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *accord R.J. Reynolds Vapor Co.*, 65 F.4th at 194 (finding in an APA challenge that plaintiff's harm was irreparable for preliminary injunction purposes where "[t]here [was] no suggestion . . . that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"); *see also* 5 U.S.C. § 702 (permitting relief "other than money damages"). To that end, "'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). Under this line of authority, a plaintiff's "lack of a 'guarantee of eventual recovery' is [a] reason that its alleged harm is irreparable." *Wages & White Lion*, 16 F.4th at 1142 (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)).

23

Third, the district court correctly held that the Final Rule threatens to inflict irreparable harm on Plaintiffs' Second Amendment protected rights. ROA.23-11199.1098-1107. "Where a plaintiff's alleged fundamental right is 'either threatened or in fact being impaired,' that plaintiff is substantially threatened with irreparable injury *per se*." ROA.23-11199.1098 (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)).

## A.     Maxim Defense.

The Final Rule directly, severely, and irreparably impacted Maxim Defense's business, which consists in substantial part of selling items targeted by the Final Rule. *See* ROA.23-11199.475, 562, 669, 847 (declarations of Maxim Defense Chief Operating Officer David Dahl). Maxim Defense is the second largest stabilizing brace manufacturer in the United States. ROA.23-11199.848. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, which made up over $5 million in sales, and braced pistols comprised about 74% of its annual firearm sales in 2022, which also made up over $5 million in sales. *Id.* Maxim Defense's reputation extends to the veteran and Tier 1/special operations community, including those who are disabled and rely on Maxim Defense's braces and braced pistols to safely operate their firearms. *Id.*

Before the publication of the Final Rule, Maxim Defense sold stabilizing braces in all 50 states, and sold braced pistols into all available states, subject to any

state-law restrictions on such firearms. ROA.23-11199.848. These products were sold through several different channels: Maxim Defense sold its stabilizing braces direct to consumers on its website; to OEM firearm manufacturers that use Maxim Defense's stabilizing brace on their own firearms; and to various dealers, distributors, and retailers across the United States. ROA.23-11199.848-850. As to its braced pistols, Maxim Defense sold directly to consumers online (subject to the transaction being processed through an FFL); and to dealers, distributors, and other licensed FFL retailers so that those retailers could then carry and sell Maxim Defense's products. *See* ROA.23-11199.848-850 (detailing Maxim Defense's sales and distribution).

The Final Rule destroyed each of these channels of commerce: the market for the products subject to the Final Rule evaporated. ROA.23-11199.850-851. Maxim Defense had several outstanding orders that were canceled or held due to the impact of the Final Rule, and the company ceased all sales of its braced pistols on January 31, 2023. ROA.23-11199.850. Maxim Defense was unable to fulfill orders for hundreds of thousands of dollars' worth of product that it could no longer transfer to buyers because of the Final Rule, and the company had manufacturing orders for thousands of braces that had been canceled and more than $1 million in materials that it purchased in anticipation of its sales in 2023 that it could no longer use for their intended purpose. Maxim Defense detailed a multi-million-dollar loss in year-

over-year sales. *Id.* As a result, of the Final Rule's impact on Maxim Defense's operations, the company drastically reduced its workforce by nearly 50% and slashed pay across the board by 15% for its remaining employees. ROA.23-11199.851.

In short, Maxim Defense established irreparable harm. The company's entire business is structured around the production and sale of stabilizing braces and braced pistols. The Final Rule functionally destroys any viable market for these products, which constitute the vast majority of its revenue and have accounted for millions of dollars of sales every year. Not only does the Final Rule "threaten[] the very existence of [its] business," sovereign immunity prevents Maxim Defense from recovering damages resulting from the Agencies' APA violations. *Wages & White Lion*, 16 F.4th at 1142. The Final Rule guts Maxim Defense's business by newly subjecting its core products to onerous regulation under the NFA—effectively shutting it out of the market. This type of market-wide impact is irreparable. No wonder that the district court "[was] not convinced that there will even be a Maxim Defense left to comply with the Final Rule" in the absence of a preliminary injunction. ROA.23-11199.1115.

The Agencies do not contest Maxim Defense's factual showing and offer little in response. They start by shortchanging the Final Rule's impact by stating that a "loss in sales does not constitute irreparable harm." Br. 38. But this Court has left

no doubt that this sort of "substantial financial injury" that "threatens the very existence of [Maxim Defense's] business" is precisely the sort of irreparable harm justifying preliminary injunctive relief. *See, e.g.*, *Wages & White Lion*, 16 F.4th at 1142 (irreparable harm where agency action forced company to stop producing a regulated product representing a substantial portion of revenue and resulted in layoffs); *R.J. Reynolds Vapor Co.*, 65 F.4th at 194 ("substantial financial losses in annual revenue" along with cost of removing product from the market constituted irreparable injury); *Texas v. EPA*, 829 F.3d at 433 (costs of imposing emissions controls in response to invalid regulation constituted irreparable harm). Beyond that, this Court has reiterated time and again that "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *id.* at 597 & n.4 (collecting cases). That is the case here due to the Agencies' sovereign immunity. *Wages & White Lion*, 16 F.4th at 1142; *R.J. Reynolds Vapor Co.*, 65 F.4th at 194.

Next, the Agencies downplay the Final Rule's impact on Maxim Defense by arguing that it did not impose costs on the company "directly," since the financial impact was instead the result of customers "choosing to purchase fewer products." Br. 38. Thus, the argument goes, Maxim Defense's financial harm is not "fairly traceable" to the Final Rule but is instead the product of "unfettered choices made by independent actors." Br. at 39 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

27

555, 560–61, 562 (1992)).[13] Nonsense. The customers' choices were obviously not "independent" of the Final Rule: they stopped purchasing as soon as it was issued. Plaintiffs do not need to show that the Final Rule is "the very last step in the chain of causation" that caused their injury. *Bennett*, 520 U.S. at 169. Rather, Maxim Defense's harm is traceable to the Agencies because it was "produced by determinative or coercive effect upon the action of" consumers. *Id.*; *see also K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (traceability requires only that a defendant "significantly contributed" to a plaintiff's injury). In other words, Maxim Defense has suffered substantial financial injury based on the "predictable effect of Government action"—*i.e.*, the Final Rule—"on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. at 2566; *accord Texas v. Biden*, 20 F.4th 928, 973 (5th Cir. 2021) (holding that an injury was traceable to government action through "a simple causal inference based on a simple change in incentives" based on regulatory action).

## B.    Individual Plaintiffs.

Plaintiffs Mock and Lewis, too, face irreparable harm in the form of nonrecoverable compliance costs. *Texas v. EPA*, 829 F.3d at 433. Both face the

---

[13] The Agencies also make a passing argument that Maxim Defense's harm is tied to customers' efforts to circumvent the NFA. Br. 39. It is unclear what the point of this is. If anything, it is an effort to relitigate the merits of the APA challenge, which this Court has already adjudicated in Plaintiffs' favor.

choice of either subjecting themselves to the NFA's heightened requirements against their wishes, destroying or divesting themselves of their constitutionally protected property, or facing criminal prosecution and prison.

Plaintiffs Mock and Lewis currently lawfully possess firearms that will likely subject them either to potential criminal liability or to costly and burdensome requirements under the Final Rule. ROA.23-11199.480-482, 483-486. Moreover, because the Final Rule's 120-day non-enforcement period has concluded, if Plaintiffs Mock and Lewis were not covered by an injunction, they would have no choice but to destroy or divest themselves of their constitutionally protected property, or else be subject to criminal prosecution. *Id.* As the district court correctly observed, this choice inflicts real costs on individuals subject to the Final Rule: Based on the ATF's own analysis, these costs range from $270 (the average cost of a brace), to $1,134 (the average cost of reconfiguring a pistol into a rifle with a long barrel), to $2,500 or more (the cost of a braced firearm). ROA.23-11199.1097-1098.

The Agencies are thus wrong to argue that the Final Rule only imposes a "de minimis" cost. Br. 35. But even if the Agencies were correct to focus narrowly on the cost of complying with the NFA (*i.e.*, paying the $200 transfer tax), this Court

has left no doubt that this is more than sufficient to establish irreparable harm.[14] "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm," *Rest. L. Ctr.*, 66 F.4th at 597, and "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts.'" *Texas v. EPA*, 829 F.3d at 433–34 (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). So "even under the Government's best theory of the case," Plaintiffs have established sufficient harm. *Louisiana v. Biden*, 55 F.4th at 1035.

The Agencies also argue that Plaintiffs' harm is "self-inflicted" because they did not register their firearms during the Final Rule's grace period. Br. 34–35, 36. As the district court recognized in *VanDerStok v. Garland*, however, "a plaintiff's purported choice to comply—or else—with a challenged government dictate, as evidenced by the plaintiff's decision to desist from engaging in the regulated activity, is adequate to establish irreparable harm." 633 F. Supp. 3d 847, 857 (N.D. Tex. 2022). The government's circular argument improperly presumes the Final Rule is lawful, which this Court has rejected. And Plaintiffs' harm is not self-inflicted: Plaintiffs and other similarly situated individuals acquired braced pistols

---

[14] While the Agencies state that someone could theoretically sue for a tax refund to recover the $200 NFA transfer tax, Br. 36, this is beside the point. As the district court recognized, Plaintiffs' costs of compliance far exceed the NFA's tax, and the Agencies do not dispute that those costs are unrecoverable due to sovereign immunity.

in reliance on the Agencies' longstanding regulatory interpretation that such arms are not subject to the NFA. Their harm is due solely to the Final Rule, which retroactively changed the Agencies' decade-long position to treat all braced pistols as if they are and have always been short-barreled rifles.

Finally, the district court correctly considered the Final Rule's impact on Plaintiffs' Second Amendment protected rights when evaluating the threat of irreparable harm. ROA.23-11199.1098-1107. This is consistent with this Court's longstanding recognition that the threatened deprivation of constitutional rights constitutes irreparable injury. *See, e.g.*, *BST Holdings*, 17 F.4th at 618 (holding that "the loss of constitutional freedoms 'for even minimal periods of time . . . unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Deerfield Med. Ctr.*, 661 F.2d at 338 (the conclusion that a constitutional right "is 'either threatened or in fact being impaired' . . . mandates a finding of irreparable injury"); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295–96 (5th Cir. 2012) (same).

The district court conducted a careful analysis under the test set out in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and concluded that the Final Rule "substantially threatens to inflict irreparable constitutional harm" by depriving Plaintiffs "of their fundamental right to keep and bear commonly used arms as a means of achieving the inherently lawful ends of self-defense." ROA.23-

11199.1099. In reaching this conclusion, the district court had the benefit of the substantial administrative record; the evidence produced by Plaintiffs; and the parties' briefing on the Second Amendment question, including the Agencies' compilation of historical regulations in an effort to meet their burden under *Bruen*. *See* ROA.23-11199.435-439, 457-460 (Plaintiffs' Preliminary Injunction Brief); ROA.23-11199.523-532 (Agencies' Preliminary Injunction Opposition Brief); ROA.23-11199.551-553 (Plaintiffs' Reply).

Thus, this is not, as the Agencies would have it, a case where Plaintiffs have simply alleged a "meritless" constitutional violation or seek through "mere 'invocation'" of the Second Amendment to conjure irreparable harm. Br. at 37. Rather, Plaintiffs substantiated "an imminent, non-speculative irreparable injury" to their Second Amendment protected rights, which were both "threatened [and] in fact being impaired" by the Final Rule absent injunctive relief. *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016) (citation omitted). As the district court put it, the individual Plaintiffs "and thousands of other FPC member-firearm owners have been relegated to either suffer the irrecoverable and constitutionally burdensome costs of compliance with the unlawful Final Rule, 'or else' run the risk of criminal prosecution and imprisonment for engaging in the fundamental right to keep and bear arms for lawful self-defense purposes." ROA.23-11199.1109; *see also Mock*,

75 F.4th at 588 (Willett, J., concurring) (observing that the Final Rule "would likely fail constitutional muster" under the Second Amendment).

In short, the individual Plaintiffs established that they were likely to suffer irreparable harm.

### C.     Firearms Policy Coalition And Its Members.

The district court correctly concluded that Plaintiff FPC's members would sustain irreparable injury in the absence of preliminary relief as well, since many of its members (including Mock and Lewis) lawfully possess firearms that would likely subject them either to potential criminal liability or to costly burdensome requirements under the Final Rule. ROA.23-11199.1107-1110. As the district court explained, "FPC's membership spans into the hundreds of thousands and across the entire United States," and these members rely "upon FPC to collectively vindicate their ability to maintain current possession of their braced pistols or acquire prospective braced pistols for lawful home- and self-defense applications." ROA.23-11199.1107-1108. After reviewing the evidence, the court "ha[d] little trouble finding that there are likely hundreds of thousands of FPC member-firearm owners similarly situated to Mock and Lewis," who "have been relegated to either suffer the irrecoverable and constitutionally burdensome costs of compliance with the unlawful Final Rule, 'or else' run the risk of criminal prosecution and imprisonment for engaging in the fundamental right to keep and bear arms for lawful self-defense

purposes." ROA.23-11199.1109. As a result, FPC's members' "cleared the threat-of-irreparable-harm hurdle by a safe margin." ROA.23-11199.1110.

The district court's ruling in this regard—and its decision to fashion relief extending to all FPC members, *see* § III(A), *infra*—was entirely proper. Since FPC has standing to pursue this action as a representative of its members, it was appropriate for the district court to "consider whether the . . . members of the organizations would suffer irreparable harm in the absence of an injunction." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020); *see also, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (National Wildlife Federation established irreparable harm to its interests as an organization based on representative harm to its members); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (organization established irreparable harm based on impacts to its members); *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020) (same); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020) (organization suffered irreparable injury where agency rule "harm[ed] their mission," including through diversion of resources). FPC has hundreds of thousands of members throughout the country. Its membership includes many individuals (like Plaintiffs Mock and Lewis) who are impacted by the Final Rule, which regulates the braced pistols and stabilizing braces they already own and restricts their ability to obtain those products without

complying with the NFA's requirements. ROA.23-11199.1107-1108, 471-474. FPC's many commercial members—including Maxim Defense—have had their business practices upended by the Final Rule, which has caused them to suffer extreme losses and lost profits that may drive them out of business entirely. ROA.23-11199.1110-1115, 473-474.

The Agencies do nothing to dispute any of this. They respond only that FPC did not suffer irreparable harm because the organization's member-Plaintiffs (Maxim Defense, Mock, and Lewis) failed to establish sufficient injury to warrant a preliminary injunction. Br. 40. As explained above, however, the Agencies' irreparable harm arguments fail. In any event, this Court's "deferential" review of the district court's ruling "leaves [factual findings] undisturbed unless clearly erroneous." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). The Agencies have made no showing of error here.

\* \* \*

In sum, Plaintiffs have suffered and continue to face irreparable harm if injunctive relief is not granted.

## II. The District Court Correctly Ruled That The Balance Of Equities Favored Preliminary Injunctive Relief From The Final Rule's Enforcement.

The district court correctly ruled that the balance of equities and public interest—which "merge when the Government is the opposing party," *Mock*, 75

F.4th at 577—both favored injunctive relief. ROA.23-11199.1116-1117. As this Court has repeatedly held, the public has a strong interest in ensuring the federal government acts within lawful bounds. "It is of highest public importance that federal agencies follow the law." *R.J. Reynolds Vapor Co.*, 65 F.4th at 195; *see also Texas v. United States*, 40 F.4th at 229 (noting the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation and quotations omitted)). And "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th at 1035 (quoting *State v. Biden*, 10 F.4th at 560); *see also Wages & White Lion*, 16 F.4th at 1143 (same). In short, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

The Agencies, on the other hand, suffer no harm from an injunction that maintains the decade-long status quo regarding what constitutes a "rifle" until the Final Rule is struck down on the merits. As the district court recognized, "there is *no* injury that the Government Defendants or public at-large could possibly suffer from if enforcement of the Final Rule were enjoined." ROA.23-11199.1117.

The Agencies trot out two brief arguments to claim the equitable factors tilt back in their favor. Neither is persuasive.

36

First, the Agencies claim that the Final Rule "promotes regulatory clarity and consistency" and a preliminary injunction therefore "promote[s] confusion." Br. 40–41.[15] This argument wrongly presumes the legality of the Final Rule in the first place. "[N]either [the government] nor the public has any interest in enforcing a regulation that violates federal law." *All. for Hippocratic Med.*, 78 F.4th at 251. Because this aspect of the interest-balancing analysis "collapses with the merits," "[i]t follows that [the Agencies] and the public will not be injured by an order staying [the government's] likely unlawful actions." *Id.*

Second, the Agencies argue that the Final Rule furthers general interests in public safety. Br. 41, 43. This claim overlooks the fact that preliminary relief here would maintain the preexisting status quo—extending over a decade—where ATF maintained that stabilizing braces and braced pistols were not subject to regulation under the NFA. As the district court recognized in *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d 722, 730 (2022), "any injury to the Government's general interest in law enforcement and public safety is appreciably undermined by [a] preliminary determination that the Final Rule is likely unlawful." And "[j]ust as the Government has an interest in the law's enforcement, so too does the public have an

---

[15] As set forth in further detail below, the government's interest in providing "regulatory clarity and consistency," Br. 40, can be achieved through a universal injunction. *Feds. For Med. Freedom*, 63 F.4th at 388 ("piecemeal enforcement" would "undermine[] rather than support[] the Government's purported interest in" regulatory consistency). *See* § III(B), *infra*.

equally compelling interest in enforcement of the laws that govern its governing authorities." *Id.* at 731. The Agencies cannot avoid the consequences of violating the APA simply by appealing to general notions of public safety.

The Agencies also contend that the district court's analysis of the equitable factors was flawed in that it "collapse[d]" the interest-balancing test into the merits. Br. 42. Not so. The court below considered each of the equitable factors and determined they weighed in Plaintiffs' favor. ROA.23-11199.1116-1117. To be sure, in the context of an APA challenge, a finding that the federal government has violated the law may well be determinative of the balance of the equities and public interest. *See All. for Hippocratic Med.*, 78 F.4th at 251 (citing, *inter alia*, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding that an "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest," because "[t]here is generally no public interest in the perpetuation of unlawful agency action")). But that is not because a court has failed to conduct each step of the preliminary injunction analysis—it is because the government has violated the law. In such cases, courts have uniformly held that the public interest supports holding the government to account and that neither the government nor the public suffer any appreciable harm from an injunction ending unlawful agency action.

The federal government does not seem to get the message no matter how many times this Court says it. So, once again: There is "no public interest in the perpetuation of unlawful agency action," and there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States*, 40 F.4th at 229 (citations omitted).

In sum, the equitable factors decisively favor a preliminary injunction.

## III.  The District Court's Injunction Is Appropriately Tailored—And This Court Should Affirm *Britto*'s Universal Injunction.

### A.  The District Court Properly Extended Injunctive Relief To FPC's Members.

The Agencies ask this Court to pare back the preliminary injunction, claiming that it inappropriately reaches all FPC members throughout the Nation instead of just the two individual Plaintiffs. Br. 48–52. The only legal basis for this extraordinary request is this Court's decision in *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826 (5th Cir. 1997), which the Agencies say requires an organizational plaintiff to produce "indicia of membership" to establish that it is a "bona fide" membership organization that has authority to sue on its members' behalf. Br. 49; *see also* Br. 50 (claiming that the organizations have not explained how their members "exercise oversight or control" over the organization). The point of this unusual exercise seems to be casting doubt on the organizations' legitimacy. To drive the point home, the Agencies use scare quotes around "members" three times; once they even say "so-called 'members.'" Br. 50. At bottom, the Agencies

claim that "organizational plaintiffs may not purport to litigate on behalf of all their many unidentified members." Br. 51. This misstates foundational principles governing associational standing.

First things first: *Friends of the Earth* does not impose such a test—it simply purported to apply the standard set by the Supreme Court in *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). But even if the Agencies accurately characterized *Friends of the Earth*, that decision does not control here. The Supreme Court recently rejected an argument—functionally identical to the one that the Agencies advance here—relying on stray language in *Hunt* to challenge associational standing based on a claim that a plaintiff was "not a 'genuine' membership organization." *Students for Fair Admissions, Inc.*, 600 U.S. at 199–201. The Court explained that "[t]he indicia of membership analysis employed in *Hunt* has no applicability" in cases involving a "voluntary membership organization with identifiable members." *Id.* at 201. "Where . . . an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Id.* Such is the case here.

In all events, there was substantial evidence in the record confirming FPC's standing to pursue relief on behalf of its members. ROA.23-11199.471-474, 475, 480, 483; *see* ROA.23-11199.1107-1110 (detailing the harm to FPC's hundreds of thousands of individual members). "Associations may assert the standing of their

own members." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021). And because "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members," *United Food & Commercial Workers Union v Brown Group. Inc.*, 517 U.S. 544, 546 (1996) (citation omitted), courts properly issue preliminary injunctive relief that extends to an association's membership. *E.g.*, *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1117 (W.D. Tex. 2021) (enjoining enforcement of state law against plaintiff organizations "and their members"); *accord All. for Hippocratic Med.*, 78 F.4th 210 (organizations had standing to seek a preliminary injunction based on their members' injury). As this Court observed in the earlier appeal, "the en banc court [has] permitted a nationwide injunction because the organization's membership numbered thousands, and the members were scattered nationwide." *Mock*, 75 F.4th at 587 (citing *Feds for Medical Freedom*, 63 F.4th at 387–89).

Accordingly, the district court properly extended injunctive relief to protect FPC's members.

**B.      The Court Should Affirm *Britto*'s Universal Injunction Staying The Final Rule In Its Entirety.**

The Court should affirm the *Britto* court's order staying the Final Rule in its entirety.[16] A universal injunction barring the Agencies from enforcing the Final Rule is necessary to preserve Plaintiffs' "status or rights," 5 U.S.C. § 705, while the litigation is pending and aligns with the final relief—vacatur—available to them on the merits. Enjoining the Final Rule to preserve the status quo prior to its publication is essential to provide the parties relief from the harm caused by the Final Rule. Given the extensive reach of the Final Rule across all steps of the commercial chain, the market disruption caused by the Final Rule cannot truly be remedied unless the Final Rule is universally enjoined across the country.

1.      Under the APA, Congress has expressly authorized courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or *to preserve status or rights pending conclusion of the review proceedings*[,]" 5 U.S.C. § 705 (emphasis added) ("Section 705"). The APA thus establishes that the Court may enter wholesale relief against *any* enforcement of a challenged regulation pending the outcome of litigation. Indeed, this becomes even clearer when viewed against the *final* remedy authorized by the APA, which is wholesale vacatur of a

---

[16] Although the *Britto* court stayed enforcement of the Final Rule under the APA and did not issue an injunction, the practical effect of either remedy is the same and aligns with the complete vacatur of agency action available on the merits.

rule; *i.e.*, a ruling that would "hold unlawful and set aside agency action, findings, and conclusions[.]" 5 U.S.C. § 706. To remedy an APA violation, "vacatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (citations omitted); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 48–54 (D.D.C. 2020) (holding that a universal injunction in the APA context "is consistent with 'established principles of equitable discretion'"); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (in APA cases, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed") (internal quotation marks omitted).

Preliminary relief under the APA must also account the scope of final relief that plaintiffs may achieve. To "preserve status or rights" in a suit that could lead to vacatur of the challenged rule entirely, the court must be entitled to enjoin any enforcement of the rule during the pendency of a lawsuit. Courts have long recognized that preliminary relief under Section 705 properly may extend to ordering the defendant agency to cease enforcement of a challenged rule altogether. *See Nat'l Fed'n of Indep. Bus. v. Perez*, No. 16-cv-00066, 2016 WL 3766121, at *46 (N.D. Tex. June 27, 2016) (holding, in the preliminary injunction context, that "a nationwide injunction is appropriate" in a "facial challenge" under the APA); *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016) ("A

nationwide injunction is appropriate when a party brings a facial challenge to an agency action under the APA," and issuing a nationwide preliminary injunction).[17] This provision "authorize[s] relief from agency action for any person otherwise subject to the action, not just as to plaintiffs." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 48. Accordingly, Section 705 "'authorizes courts to stay agency [action] pending judicial review,' not just to enjoin their application to the injured parties before the court." *Rai v. Biden*, 567 F. Supp. 3d 180, 202 (D.D.C. 2021) (citation omitted). And this includes "the power to compel agency inaction when necessary 'to preserve status or rights pending conclusion' of the action." *Id.* (citation omitted).

Because courts have the final authority to set aside a rule completely, it must follow that they have the authority to preliminarily enjoin a rule to the same extent.

---

[17] As one district court explained, "[n]ationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated" because "[o]nce that 'egg has been scrambled,' 'restor[ing] the status quo ante' will be considerably more disruptive." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49 (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)); *see also id.* (collecting cases affirming universal preliminary injunctions halting agency action); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 61–62 (D.D.C. 2020) (reviewing authority "confirm[ing] the propriety of nationwide injunctions in APA cases" and issuing nationwide preliminary injunction where a party-limited injunction "would not provide Plaintiffs with any meaningful relief, let alone 'complete relief'"). In other words, "[n]ationwide relief at the preliminary stage also ensures that complete relief remains available to the plaintiffs after that final adjudication." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49.

"[I]f a court can ultimately 'set aside' a rule for everyone once it reaches the merits, then the APA plainly authorizes the court to issue a *preliminary* injunction that bars the enforcement of the contested rule against anyone pending its merits decision on whether to vacate the rule." Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1126 (2020); *see also id.* at 1158 ("Modern courts reviewing agency action under the APA are therefore on firm footing when they issue universal preliminary injunctions against rules to preserve the status quo pending judicial review."). This is consistent with the Supreme Court's longstanding recognition that "injunctions should be crafted to 'provide complete relief to the plaintiffs.'" *Mock*, 75 F.4th at 587 (quoting *Califano*, 442 U.S. at 702).

In *Nevada v. United States Department of Labor*, for example, the Eastern District of Texas reviewed a final rule issued by the Department of Labor that sought to "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." 218 F. Supp. 3d 520, 524 (E.D. Tex. 2016). After determining that the rule likely exceeded the scope of defendants' authority, predominately because it departed from the plain meaning of the authorizing statute, the court turned to the scope of the injunction. *Id*. at 527–33. It explained that the rule applied "to all states," so that harm will "extend[] nationwide" if the injunction does not protect everyone, regardless of their location. *Id.* at 534. Broadly applicable injunctions have also been granted by courts in this Circuit where

an agency's final rule has general applicability nationwide and the court has determined the rule is likely unlawful. *See Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016); *Nat'l Fed'n of Indep. Bus.*, 2016 WL 3766121, at *46.

The Court has approved this practice, specifically in the context of preliminary injunctions issued pursuant to APA challenges. "[T]he Constitution vests the District Court with 'the judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. CONST. ART. III, § 1). And "[a]n injunction . . . is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Prof. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 273–74 (5th Cir. 1984).

So too here: The Final Rule plainly applies to all people nationwide. The Final Rule confirms that its "intent . . . is to . . . ensure consistent application of the statutory definition of 'rifle.'" Final Rule, 88 Fed Reg. at 6,502. And the record demonstrates the nationwide havoc the Final Rule has wrought on the sellers and purchasers of the brace products that the Final Rule seeks to regulate. ROA.23-

11199.847-853, 854-856, 857-859, 788-792, 794-798, 800-803, 805-812. Given the universal and nationwide scope of the harm imposed by the Final Rule, a universal and nationwide injunction prohibiting the Defendants from enforcing the Final Rule is appropriate—and indeed necessary—to "preserve [Plaintiffs'] status [and] rights" here.

2.      Separate and apart from the APA context, basic "equitable principles" confirm that a universal injunction is appropriate given the nationwide scope of the Agencies' overreach, the nationwide scope of the Plaintiffs' operations, and the integrated nature of the already-heavily-regulated firearms market. *Feds for Med. Freedom*, 63 F.4th at 387. In *Feds for Medical Freedom*, this Court affirmed a universal preliminary injunction against the Biden Administration's vaccine mandate executive order to "maintain the status quo" where an associational plaintiff had thousands of members "spread across every State in the Nation," and the Court was confronted with a nationwide policy that warranted "consistency" in enforcement, rather than "piecemeal" resolution to those affected. *Id.* at 387–88.

Here too, issuing a universal injunction is necessary to most closely preserve, during this litigation, the status quo that held prior to publication of the Final Rule. Before ATF published the Final Rule, the market for stabilizing braces and braced

pistols extended throughout the nation.[18] The record below contextualizes this reality: Maxim Defense sold its brace products in every state. ROA.23-11199.848-850. Maxim Defense sold directly to consumers in all 50 states through its website. ROA.23-11199.848-849. It sold to seven distributors throughout the nation who, in turn, sold Maxim Defense's products to retailers in every state. ROA.23-11199.849-850; *see also* ROA.23-11199.854-856, 857-859. Likewise, Maxim Defense sold braces directly to eleven OEM manufacturers who incorporated them into braced pistols sold throughout the United States. ROA.23-11199.849.

A universal injunction is the only path for retailers like Maxim Defense to completely avoid irreparable harm. A party-limited affords only *theoretical* or partial relief because the Final Rule eviscerated the market for the products subject to regulation. As Plaintiffs demonstrated below, the market will not fully reopen for Maxim Defense unless and until the millions of persons affected by the Final Rule get assurance from the judicial branch that they will not face prosecution for engaging in the acts proscribed by the Final Rule. ROA.23-11199.851-853, 855-856, 858-859.

Furthermore, a universal injunction ensures predictability and stability while this litigation proceeds by maintaining the regulatory status quo. *Feds. For Med.*

---

[18] And, of course, FPC's hundreds of thousands of members are spread across the country. ROA.23-11199.1107-1108, 472-474.

*Freedom*, 63 F.4th at 388 ("piecemeal enforcement" would "undermine[] rather than support[] the Government's purported interest in" regulatory consistency). Here, the Agencies' stated "intent of th[e] rule is to . . . ensure consistent application of the statutory definition of 'rifle.'" Final Rule, 88 Fed Reg. at 6,502. Nationwide relief serves that end: Piecemeal adjudication—and, therefore, piecemeal enforcement—of the Final Rule's legality "would invite chaos." *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 52. Indeed, "the federal government would be expected to prefer nationwide relief in a case like this one, as an order staying or enjoining the Final Rule everywhere serves the important interest of uniformity in administration" of a federal regulation of broad applicability. *Id*.

A party-limited injunction leads to the incongruous prospect of retail shelves being stocked with Maxim Defense's braced pistols (which would not require registration as SBRs under the NFA) offered next to other manufacturers' braced pistols (which would require registration as SBRs).[19] Just as in *Feds for Medical Freedom*, "limiting . . . relief to only [the parties] would prove unwieldy and would only cause more confusion." 63 F.4th at 388. In short, meaningful relief for retailers like Maxim Defense hinges on the Final Rule not being enforced against anyone.

In short, there is little, if any, practical benefit to an injunction limited to the

---

[19] To be clear, Maxim Defense has not sought such an advantage through the injunction; rather, it seeks an orderly and fair chance to survive, pending the ultimate determination that Defendants' Final Rule must be vacated.

parties or even to all of Maxim Defense's downstream customers. Piecemeal litigation of this national issue, with the threat of criminal sanction looming over all who dare to purchase and sell the products covered by the Final Rule, invites needless further chaos. Given the practical realities of the heavily regulated firearms trade, the retailers' nationwide scope of distribution, FPC's national scope (and the national scope of the other organizations that are parties to this appeal), and the national scope of the Final Rule, the Court should affirm *Britto*'s order staying the Final Rule in its entirety or enter an injunction enjoining the Agencies from enforcing the Final Rule as to any person or entity, which would be the result required by vacatur when Plaintiffs prevail on the merits

## CONCLUSION

For all these reasons, the Court should affirm the district court's preliminary injunction order and affirm the order in *Britto* staying the Final Rule in its entirety.

Respectfully submitted,

s/ Bradley A. Benbrook

R. Brent Cooper
Nathan Curtis Flanigin
COOPER & SCULLY PC

Bradley A. Benbrook
 *Counsel of Record*
Stephen M. Duvernay
BENBROOK LAW GROUP, P.C.

Cody J. Wisniewski
FPC ACTION FOUNDATION

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on March 22, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

s/Bradley A. Benbrook
Bradley A. Benbrook

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the length limits permitted by Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,492 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.      Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Avast Security virus detector and is free of viruses.

Dated: March 22, 2024

s/Bradley A. Benbrook
Bradley A. Benbrook